EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Puerto Rico Oil Company, Inc.<br><br>Demandante Peticionario<br><br>v.<br><br>Dayco Products, Inc.<br><br>Demandado Recurrido | Certiorari<br><br>2005 TSPR 41<br><br>163 DPR _____ |

Número del Caso: CC-2002-427

Fecha: 6 de abril de 2005

Tribunal de Apelaciones:

        Circuito Regional I, San Juan

Juez Ponente:

        Hon. Héctor Urgell Cuebas

Abogados del Recurrido:

        Lcdo. Salvador Antonetti Zequeira
        Lcda. Luz Nereida Carrero Muñiz

Abogado del Peticionario:

        Lcdo. Rafael Mayoral Morales

Abogado del Centro Unido de Detallista

        Lcdo. Luis A. Meléndez Albizu
        Lcdo. Moisés Rodríguez Rodríguez

Materia: Acción Civil

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Puerto Rico Oil Company, Inc.

    Demandante Peticionario

            v.

                        CC-2002-427

Dayco Products, Inc.

    Demandado Recurrido



Opinión del Tribunal emitida por el Juez Asociado señor Rivera Pérez.




San Juan, Puerto Rico, a 6 de abril de 2005.

Mediante el recurso presentado ante nos, la parte peticionaria solicita de este Tribunal se modifique la Sentencia dictada por el Tribunal de Apelaciones el 16 de agosto de 2001, mediante la cual se eliminó cierta partida de daños, relativa al menoscabo y terminación de un contrato de distribución, incluida en la compensación concedida por el Tribunal de Primera Instancia y se le imponga a la parte recurrida el pago de honorarios de abogado.

I

Puerto Rico Oil Company, Inc., en adelante Proico, es una corporación local, establecida en 1949 y dedicada a la distribución y venta de productos automotrices e industriales. En el año 1980, esta corporación fue adquirida por Ready Mix Concrete, Inc., la cual en el año 1995 fue adquirida por Puerto Rican Cement Co., y sus acciones pasaron a manos de Capital Assets, Inc. Proico todavía consta registrada como corporación en Puerto Rico, pero no opera como tal desde mediados de 1995.[1]

Dayco Products, Inc., en adelante Dayco, es una corporación foránea, organizada bajo las leyes del estado de Ohio, cuyas oficinas principales están en esa jurisdicción. Se dedica a la manufactura de correas y mangas para motores, tanto de automóviles, como para usos industriales.[2]

En el año 1980, comenzaron las relaciones comerciales entre Proico y Dayco. Pactaron verbalmente la distribución de productos Dayco en Puerto Rico. El 27 de marzo de 1981 firmaron un documento contractual, una "carta contrato", en la cual "Dayco ratificó a Proico como distribuidor exclusivo para Puerto Rico e Islas Vírgenes de sus productos automotrices e industriales"[3].

---

[1] Apéndice del recurso de Certiorari, pág. 4.

[2] Íd., pág. 5.

[3] Íd., págs. 5 y 500.

El 23 de abril de 1982, las partes suscribieron dos acuerdos, uno que mantenía a Proico como distribuidor exclusivo de los productos automotrices, y otro con términos similares al primero pero con la salvedad de que no se le concedía a Proico la distribución exclusiva de los productos industriales. [4] El contrato de distribución exclusiva de los productos automotrices tendría una duración de tres (3) años. Entre otras cosas, las partes acordaron en dicho contrato lo siguiente:

> 2.EXCLUSIVE APPOINTMENT (...) DAYCO appoints DISTRIBUTOR [5] as a DAYCO exclusive distributor in Puerto Rico and the U.S Virgin Islands for the sale of DAYCO AUTOMOTIVE PRODUCTS.
>
> (…)
>
> 8.DAYCO´S OBLIGATIONS. DAYCO agrees not to appoint any other person or entity in the TERRITORY for the distribution of the PRODUCTS without the prior written consent of DISTRIBUTOR. Further, DAYCO will provide DISTRIBUTOR with:
>
> (a) Reasonable supplies of literature and necessary data in order to assist DISTRIBUTOR in the promotion and sale of DAYCO PRODUCTS.
> (b) Prompt service on all request and orders subject to the terms and conditions contained herein.
> (c) All information and inquiries received from the TERRITORY for the

---

[4] Íd., págs. 5, 503, 3116. Moción Informativa, Estipulaciones de las Partes, presentada el 29 de mayo de 1996, página 2.

[5] Entiéndase que cuando se hace referencia a "DISTRIBUTOR", se refiere a Proico.

> PRODUCTS for sales actions and
> follow-up.
>
> (…)
>
> 9.      <u>DISTRIBUTOR´S      OBLIGATIONS</u>.
> DISTRIBUTOR shall actively promote and
> sell the PRODUCTS in accordance with the
> prices, terms and conditions set forth
> herein. Further, in order to promote
> sales of DAYCO PRODUCTS DISTRIBUTOR
> agrees to:
>
> (a) Provide an aggressive merchandising
>     effort to meet competition and keep
>     pace with the growth of the market.
> (…)
> (f) Maintain sufficient inventory to
>     meet customer requirements.[6]

La relación existente entre las partes continuó hasta el momento en que venció el plazo de tres años. No obstante, se mantuvieron observando generalmente los mismos términos y condiciones que habían dispuesto en los contratos escritos y que habían observado hasta entonces.[7] A partir del año 1986, Dayco disminuyó sustancialmente el número de catálogos provistos a Proico, los cuales se había comprometido a suplir. Esta disminución sustancial provocó que no hubiese los suficientes catálogos para satisfacer las necesidades de los clientes de Proico, por lo que sus ventas se vieron adversamente afectadas.[8] Este mismo año comenzaron a surgir otros problemas que también afectaron la relación contractual entre Proico y Dayco. Tales problemas

---

[6] Íd., págs. 503-505.

[7] Íd., págs. 6 y 3117.

[8] Íd., págs. 6, 7 y 3117.

fueron: demoras en el despacho de la mercancía ordenada por Proico (en ocasiones por periodos de varios meses), órdenes incompletas, y problemas de "back orders".[9] Las repercusiones de estos problemas se comenzaron a reflejar para el año 1989, provocando discrepancias entre las partes.

> ...el problema de despacho de órdenes incompletas trajo consigo discrepancias entre Proico y Dayco respecto al monto de ciertas facturas, las cuales eran facturadas cual si hubiesen sido despachadas en su totalidad. Al Proico protestar el pago de ciertas facturas que incluían mercancía aún no despachada, Dayco procedió a retener el despacho de órdenes de compra posteriores sin antes verificar la corrección de las facturas protestadas. Ello exacerbó la situación e incrementó los problemas existentes de inventario.[10]

Tras estos problemas, a mediados del año 1990, Dayco decidió buscar otro distribuidor en Puerto Rico para sus productos automotrices. El 31 de octubre de 1990, le informó a Proico que tenía interés en darle fin al contrato de exclusividad y nombrar un nuevo distribuidor. Además, en la misma comunicación, le incluyó un relevo de responsabilidad y renuncia de derechos para que éste lo suscribiera. Proico se negó a firmar tal relevo y a renunciar a sus derechos de exclusividad.

Sin embargo, a pesar de la negativa de Proico de renunciar a sus derechos de exclusividad, Dayco comenzó a

---

[9] Íd., págs. 7 y 3118.

[10] Íd.

hacer gestiones, a través de John Prior, Inc., con la firma Auto Parts International, en adelante API, para ofrecer a éstos la distribución no exclusiva de sus productos en Puerto Rico. Antes de estas gestiones y aparte de su relación contractual con Proico, Dayco tenía ciertas relaciones de distribución con John Prior Inc., compañía localizada en el estado de Nueva York. Mientras Proico distribuía productos automotrices marca Dayco, Dayco manufacturaba y mercadeaba algunos de sus productos mediante el sistema de marcas privadas ("private labels"), los cuales eran distribuidos por John Prior, Inc.

> Dicho sistema consiste en mercadear con precios más bajos productos equivalentes a aquellos que llevan la etiqueta Dayco, pero utilizando etiquetas que los identifican con nombres distintos.[11]

Dayco estableció una relación con API, la cual recibió trato preferencial frente a la relación con Proico. Esta nueva relación recibió tratos preferenciales tales como: los costos de flete de los productos eran divididos entre Dayco y API; se establecieron mecanismos para asegurar una entrega más rápida y completa de los productos a API; y se le brindaron mejores precios que los ofrecidos a Proico.[12] Sin embargo, Proico tenía que pagar los costos de flete en su totalidad y los mecanismos de entrega de productos no habían resultado del todo efectivos.

_____

[11] Íd., pág. 6.

[12] Íd., pág. 9.

Contribuyó a la disminución del despacho de mercancía, la situación de que en varias ocasiones Dayco le impuso a Proico condiciones que restringían la entrega de las órdenes. El 30 de noviembre de 1992, Dayco se negó a despachar una orden a menos que Proico renunciase a sus derechos de exclusividad.[13] Luego, ya presentada la demanda, Dayco nuevamente se negó a despachar otra orden aduciendo que Proico le adeudaba la suma de $28,917.94.[14] Este tipo de situación fue empeorando la entrega de productos a Proico y culminó en la suspensión del despacho de piezas en 1992.

El 1ero de octubre de 1992 Proico radicó una demanda contra Dayco al amparo de la Ley de Contratos de Distribución[15]. El Tribunal de Primera Instancia, en la sentencia emitida, describió la reclamación de la demandante de la siguiente forma:

> En primer lugar la parte demandante alegó la existencia de un contrato para la distribución por parte de ésta de productos automotrices y de productos industriales de Dayco. Alegó además que Dayco había incurrido en un patrón de menoscabo de la relación contractual de distribución que culminó en la terminación del alegado contrato sin que mediare justa causa y el nombramiento de un nuevo distribuidor para dichos productos en Puerto Rico, todo ello en violación a los términos del contrato.[16]

---

[13] Íd.

[14] Íd., pág. 9 y 10.

[15] Ley Número 75 de 24 de junio de 1964, 10 L.P.R.A. secs. 278-278e.

[16] Apéndice del recurso de Certiorari, Pág. 3114.

Además, incluyó a API como demandada y le reclamó una compensación en daños y perjuicios por su alegada interferencia torticera con la relación contractual preexistente entre Proico y Dayco. La codemandada API contestó la demanda y levantó como defensa afirmativa, la prescripción de la acción de daños. Por su parte, Dayco, al contestar la demanda, negó la existencia del alegado contrato de distribución y alegó que de existir una relación con Proico, la misma terminó por justa causa. Además, arguyó que las ventas de Proico habían mermado y que los daños reclamados por concepto de la alegada terminación eran exagerados y especulativos.[17]

Dayco instó reconvención mediante la cual le reclamó a Proico una supuesta deuda de $28,917.94. Proico reconoció una deuda de $23,942.20, pero alegó que ya había expedido un cheque por tal cantidad. Respecto a la codemandada API, la demandante desistió con perjuicio de la demanda en su contra, a cambio de que ésta se comprometiera a poner a su disposición dos testigos para ser utilizados en el juicio.

Tras celebrado el juicio en su fondo, el Tribunal de Primera Instancia dictó sentencia el 18 de septiembre de 1998 resolviendo a favor de la parte demandante. Concluyó que Dayco violó el contrato de distribución que tenía con Proico al utilizar en Puerto Rico otros agentes para distribuir sus productos y darle trato preferencial a éstos. En cuanto a la reconvención instada por Dayco y la

---

[17] Íd., pág. 11.

alegada falta de pago, determinó que ello no constituía justa causa para terminar el contrato, pues Proico siempre había pagado sus facturas y Dayco nunca había cuestionado su solvencia económica ni su capacidad de pago, ni le exigió colateral para respaldar su crédito. Además, Dayco no recibió jamás de Proico un cheque de pago que no tuviese fondos.[18]

Concluyó el Tribunal de Primera Instancia que las actuaciones de Dayco, además de tener carácter doloso por responder a su interés de castigar a Proico por negarse a renunciar al contrato de exclusividad[19], afectaron adversamente la relación de la demandante con sus clientes y sus ventas. La conclusión de la sala sentenciadora fue la siguiente:

> En resumen, fue la conducta reiterada de menoscabo por parte de Dayco la causa directa del deterioro y merma en ventas y/o ganancias de Proico en lo relacionado con la distribución de los productos Dayco. Las demoras en el despacho, despacho incompleto, limitaciones en cuanto a los materiales de apoyo en ventas, tales como los catálogos, que eran imprescindibles para trabajar las ventas y finalmente el trato preferencial concedido a API como nuevo distribuidor no exclusivo tuvieron el efecto directo de causar en la operación de Proico mermas en la venta de los productos de Dayco hasta la eventual terminación de la relación. La prueba documental y las declaraciones de los testigos sustentan nuestra determinación y restan apoyo al argumento de Dayco para intentar

---

[18] Íd., pág. 11, 12, 3120.

[19] Íd., pág. 9.

> establecer que la merma en ventas constituyó causa justificada para terminar la relación. La prueba documental estipulada apoya la posición de Proico y demuestra la buena intención y disposición de Proico para lograr [un] aumento en las ventas así como los numerosos intentos y solicitudes de ésta a Dayco para que corrigiera los problemas que estaban afectando dichas ventas.[20]

En cuanto a la cuantía de los daños a compensar, el Tribunal de Primera Instancia consideró el informe del perito de Proico, el Contador Público Autorizado, señor Fernando Rodríguez Amaro, por considerarlo más acertado que el informe del perito de Dayco. Utilizó este informe para computar los daños a conceder al amparo de la Ley 75, s*upra*. El cómputo para determinar la cuantía incluía: la suma de $95,049, correspondiente al inventario en poder de Proico; $719,445 como beneficio anual recibido por Proico durante los últimos cinco años del contrato y como consecuencia de la distribución de productos automotrices e industriales; y $124,461 como compensación por concepto de plusvalía. Concediendo un total de $938,955. De la compensación concedida, no hizo ninguna deducción por concepto de impuestos. A la parte perdidosa no se le impuso el pago de costas u honorarios de abogado.

Ambas partes presentaron recurso de apelación ante el Tribunal de Apelaciones. Proico alegó que el Tribunal de Primera Instancia incidió al no ordenar a Dayco el pago de

---

[20] Íd., pág. 12 y 3120-3121.

costas y al no conceder honorarios de abogado. Por su parte, Dayco arguyó que el foro sentenciador incidió en varios asuntos: (1) al concluir que la propuesta comunicada por Dayco el 31 de octubre de 1990 constituyó una terminación de la relación contractual; (2) al no concluir que había justa causa para terminar el contrato de distribución exclusiva con Proico y nombrar un nuevo distribuidor; (3) al estimar que la demora en el envío de catálogos y órdenes a Proico anuló cualquier justa causa que Dayco pudiese tener para nombrar otro distribuidor; y (4) al computar y conceder a Proico daños excesivos.[21]

El Tribunal de Apelaciones consolidó ambos recursos y emitió sentencia el 16 de agosto de 2001. Determinó que no incidió el Tribunal de Primera Instancia al declarar con lugar la demanda de autos presentada por Proico y que no cometió los errores planteados por Dayco, excepto en cuanto a la determinación de la cuantía concedida en concepto de daños, la cual modificó para reducirla. Respecto al señalamiento de error levantado por Proico, relacionado a las costas y a los honorarios de abogado, determinó que el foro de primera instancia incidió al no ordenar el pago de costas a favor de Proico, mas concluyó que no procedía la imposición de honorarios de abogado debido a la ausencia de conducta temeraria de parte de Dayco. Confirmó la sentencia apelada y ordenó al Tribunal de Primera Instancia modificar la compensación otorgada a

---

[21] Íd., pág. 13 y 20.

Proico, en cuanto a la partida concedida en concepto de daños y concesión de costas, en forma consistente con lo allí pautado. La demandante Proico le solicitó al foro intermedio apelativo la reconsideración de dicha Sentencia, la cual fue declarada "sin lugar" el 29 de abril de 2002, archivada en autos copia de su notificación a las partes el 3 de mayo de 2002.

Inconformes, el 3 de junio de 2002, ambas partes acuden ante nos mediante sendos recursos de *Certiorari*, de los cuales expedimos únicamente el presentado por la parte demandante de autos, Proico.

La parte peticionaria señaló como errores cometidos por el foro intermedio apelativo los siguientes:

> **I. Erró el TCA al eliminar la partida de daños por concepto de menoscabo al contrato no exclusivo de productos industriales, así como por la terminación "DE FACTO" del mismo.**

> **II. Erró el TCA al eliminar, bajo la premisa equivocada de que se trata de una doble compensación, la partida de daños concedida por el TPI por concepto de plusvalía.**

> **III. Erró el TCA al negarse a determinar, ante los hechos probados ante el TPI y sostenidos por el TCA, que la conducta litigiosa de Dayco fue temeraria, al haber negado desde un principio, no solo una total ausencia de responsabilidad, sino también la existencia misma de la relación contractual.**

El 6 de noviembre de 2002, Centro Unido de Detallistas y la corporación Tech Medical Group, Inc. presentaron ante

nos una moción, solicitando permiso para comparecer como *Amicus Curiae* en el caso de marras. Centro Unido de Detallistas es una asociación que agrupa un número significativo de pequeños comerciantes puertorriqueños, muchos de los cuales son distribuidores de productos y servicios.[22] Tech Medical Group, Inc. es una corporación local dedicada principalmente a la distribución de productos médicos especializados en el área de cirugías de espina dorsal.[23]

Los comparecientes arguyen tener un interés real en la resolución de la controversia de derecho levantada mediante el segundo error señalado en el recurso ante nos, por ser ésta de gran envergadura e importancia para todos los distribuidores puertorriqueños cobijados por la Ley 75, *supra*. Sostienen que pueden ilustrar adecuadamente a este foro en este asunto que alegan es de gran interés público.[24] Nos plantean que su interés se circunscribe a resolver la siguiente cuestión:

> Esta es, a tenor con la fórmula de daños de la Sección 3 de la Ley 75 (10 L.P.R.A. § 278b), ¿puede un tribunal denegarle a un distribuidor terminado o menoscabado, daños por concepto de pérdida de plusvalía bajo la premisa de que ello constituye doble compensación por haberse concedido daños por concepto

---

[22] Moción solicitando permiso para comparecer como *Amicus Curiae* y solicitando término, presentada el 6 de noviembre de 2002, página 1.

[23] Íd.

[24] Íd., pág. 3.

> de pérdida de ingreso, no obstante el hecho de que ambas partidas aparecen como partidas de daños separadas y diferentes en la Sección 3 de la Ley 75?[25]

El 7 de febrero de 2003, emitimos resolución, notificada a las partes el 11 de febrero de 2003. Declaramos con lugar la solicitud para comparecer como *Amicus Curiae* en cuanto al Centro Unido de Detallistas y denegamos la presentada por Tech Medical Group, Inc. El Centro Unido de Detallistas presentó su escrito como amigo de la corte el 26 de marzo del 2003.

Contando con la comparecencia de las partes nos encontramos en posición de resolver.

## II

Los primeros dos errores levantados por el peticionario están relacionados con la interpretación y aplicación de la Ley 75 de Contratos de Distribución, *supra*. Esta ley tiene el propósito de proteger los derechos legítimos de los distribuidores frente a los abusos de los suplidores o principales, que sin justa causa dan por terminadas o menoscaban sus relaciones contractuales con éstos tan pronto han creado un mercado favorable para los productos.[26] Además, persigue reconocer el valor creado por los distribuidores al desarrollar el mercado de un

---

[25] Íd., pág. 2.

[26] Systema de Puerto Rico, Inc. v. Interface International, Inc., 123 D.P.R. 379 (1989); Medina & Medina v. Country Pride Foods, 122 D.P.R. 172 (1988).

producto.[27]   La creación de esta ley surge a raíz de los abusos e incumplimientos de parte de los principales y para evitar que éstos terminen su relación contractual de distribución con los distribuidores sin reembolsarles los gastos incurridos en el desarrollo del mercado y la plusvalía del producto.[28]

La Ley 75, *supra,* define el contrato de distribución de la siguiente forma:

> (b)Contrato de Distribución- Relación establecida entre un distribuidor y un principal o concedente, mediante la cual, e irrespectivamente de la forma en que las partes denominen, caractericen o formalicen dicha relación, el primero se hace real y efectivamente cargo de la distribución de una mercancía, o de la prestación de un servicio mediante concesión o franquicia, en el mercado de Puerto Rico.[29]

Dicha ley crea una causa de acción a favor del distribuidor cuando el principal menoscaba o da por terminado el contrato de distribución sin justa. El Artículo 2 dispone:

> No empece la existencia en un contrato de distribución de una cláusula reservándole[s] a las partes el derecho unilateral a poner fin a la relación existente, **ningún principal o concedente podrá dar por terminada dicha relación, o directa o indirectamente realizar acto alguno en menoscabo de la relación**

---

[27] Ronald Martínez Cuevas, <u>El Estimado del Valor Perdido por la Cancelación de Contratos de Distribución bajo la Ley 75 de Puerto Rico</u>, 64 Rev. Jur. U.P.R. 149 (1995).

[28] Yarimar González Carrasquillo, <u>Vertical Maximum Price Fixing and Distribution Contracts Under Puerto Rican Law</u>, 68 Rev. Jur. U.P.R. 677, 684. (1999).

[29] 10 L.P.R.A. sec. 278.

> **establecida**, o negarse a renovar dicho contrato a su vencimiento normal, **excepto por justa causa**.(Énfasis nuestro)[30]

De determinarse que no hubo justa causa para la terminación o menoscabo del contrato, procede determinar la indemnización correspondiente al distribuidor afectado.

Hemos resuelto que la acción que surge de este estatuto es una torticera y como tal, es requisito esencial de la misma, la prueba sobre los daños sufridos, cuyo peso recae sobre quien los alega.[31] La parte demandante tiene la obligación de poner al tribunal en condiciones de poder hacer una determinación clara y específica, mediante la presentación de prueba, de la reclamación invocada. Una vez presentada la prueba y demostrados los daños, el principal tendrá que indemnizar al distribuidor en la medida de los daños causados.

La parte peticionaria levanta como primer error que incidió el Tribunal de Apelaciones al eliminar la partida de daños, atribuible al menoscabo y terminación "de facto" del contrato no exclusivo de productos industriales.

El legislador, al definir un contrato de distribución a los efectos de esta ley, no limitó la aplicación del estatuto a los contratos de distribución exclusiva. La ley en cuestión hace referencia a los contratos de distribución en general. Por lo tanto, todo distribuidor que sea parte

---

[30] Íd., sec. 278a.

[31] Marina Industrial, Inc. v. Brown Boveri Corporation, 114 D.P.R. 64, 90 (1983); Cotto v. C.M. Ins. Co., 116 D.P.R. 644, 650-651 (1985).

en un contrato de distribución, sea o no éste de carácter exclusivo, tendrá una causa de acción en contra del principal que menoscabe o termine el contrato sin justa causa.

El foro apelativo intermedio, en su sentencia, determinó que el Tribunal de Primera Instancia incidió al conceder daños a Proico por las pérdidas sufridas por la línea industrial, debido a que el contrato de distribución exclusiva no incluía dicha línea, sino únicamente la automotriz. Determinó que la cantidad de $719,445, estimada y concedida por el Tribunal de Primera Instancia a Proico, en concepto de pérdida de beneficios, debía ser ajustada para incluir solamente aquellas ganancias atribuibles a la línea automotriz, por ser ésta la única incluida en el contrato de distribución exclusiva.

Posteriormente, en la resolución en la que declaró no ha lugar la reconsideración sometida ante sí, aclaró, contrario a lo dispuesto en la Sentencia, estar consciente que la Ley 75, *supra,* también protege a los distribuidores no exclusivos.[32] Añadió como fundamento, para reafirmarse en su determinación de disminuir la cantidad en concepto de beneficios, que no surge de la determinación del foro de primera instancia que Dayco hubiese menoscabado o terminado sin justa causa el contrato de distribución no exclusiva de los productos industriales. Determinó lo siguiente:

_____

[32] Apéndice del recurso de <u>Certiorari</u>, pág. 3108.

> La intención del tribunal *a quo* es clara, la cuantía de daños que la sentencia concede es la relacionada a la distribución de los productos automotrices. Ello refleja la pérdida de exclusividad que conllevó la designación de Auto Parts International of Puerto Rico, Inc. (API) como distribuidor, no exclusivo, de los productos automotrices. Dicha designación no afectó la distribución no exclusiva de los productos industriales, pues Proico no tenía derecho de exclusividad sobre los mismos y, además, API no vendía los productos industriales.[33]

La determinación del Tribunal de Apelaciones, de que la intención del Tribunal de Primera Instancia es clara y dirigida únicamente a indemnizar por los productos automotrices, no nos parece correcto, como tampoco su conclusión sobre la falta de prueba para sostener el alegado menoscabo al contrato no exclusivo de distribución.

El foro primario determinó, como cuestión de hecho, que la reiterada conducta de Dayco, la cual comenzó antes de la designación de API como nuevo distribuidor, consistente en demoras en el despacho, despacho incompleto, y limitaciones en cuanto a los recursos para propiciar las ventas, por ejemplo los catálogos, menoscabó directamente las ventas y ganancias de Proico en lo relacionado con la distribución de ambas líneas de productos Dayco, la industrial y la automotriz, y por ende el contrato exclusivo y el no exclusivo. Esta conducta obstinada de Dayco afectó ambos contratos, pues la falta de catálogos fue crucial al deterioro de las ventas, tanto de los

---

[33] Íd., pág. 3109.

productos industriales como de los automotrices. Además, afectó el inventario disponible para la venta, perjudicando así la relación de Proico con sus clientes.

La posterior designación de API como nuevo distribuidor, menoscabó directamente el contrato de distribución exclusiva de los productos automotrices, mas no el contrato no exclusivo de los productos industriales. La distribución no exclusiva de productos industriales no se vio afectada directamente por la designación de API, por estar ésta dirigida a la distribución de productos automotrices. No obstante, independientemente de ésta designación, el contrato no exclusivo ya había sido menoscabado por las actuaciones de Dayco, sin mediar justa causa para ello.

Según el informe pericial presentado por Proico, en el cual se basó el Tribunal de Primera Instancia para calcular y establecer la cuantía de daños, la suma de $719,445 corresponde a la pérdida de beneficios de ambas líneas, la automotriz y la industrial. Por lo tanto, sí se presentó prueba de cómo se perjudicaron los dos contratos de distribución, el exclusivo y el no exclusivo y surge de la sentencia la intención del foro primario de conceder daños por el menoscabo causado a ambos.

Concluimos que sí erró el Tribunal de Apelaciones al eliminar la partida por concepto de menoscabo y terminación del contrato no exclusivo.

El segundo señalamiento de error levantado plantea que incidió el Tribunal de Apelaciones al eliminar la compensación por concepto de plusvalía, bajo la premisa equivocada de que se trata de una doble compensación, por también haberse concedido daños por pérdida de ingresos y haberse calculado ambas partidas según el monto de los beneficios obtenidos de la distribución durante los últimos cinco años.

El Artículo 3, de la Ley de Contratos de Distribución, *supra*, provee una serie de factores para la determinación de daños. Dispone:

> De no existir justa causa para la terminación del contrato de distribución, para el menoscabo de la relación establecida, o para la negativa a renovar dicho contrato, el principal habrá ejecutado un acto torticero contra el distribuidor y **deberá indemnizarle en la medida de los daños que le cause**, cuya cuantía se fijará a base de los siguientes factores:
>
> (a) El valor actual de lo invertido por el distribuidor para la adquisición y la adecuación de locales, equipo, instalaciones, mobiliario y útiles, en la medida en que éstos no fueren fácil y razonablemente aprovechables para alguna otra actividad a que el distribuidor estuviere normalmente dedicado.
>
> (b) El costo de las mercaderías, partes, piezas, accesorios y útiles que el distribuidor tenga en existencia, y de cuya venta o explotación no pueda beneficiarse.
>
> (c) **La plusvalía del negocio, o aquella parte de ésta atribuible a la distribución de la mercancía o la prestación de los servicios de que se trate, a ser determinada dicha plusvalía**

tomando en consideración los siguientes factores:
1. Número de años que el distribuidor ha tenido a su cargo la distribución;
2. volumen actual de distribución de la mercancía o prestación de los servicios de que se trate y la proporción que representa en el negocio del distribuidor;
3. proporción del mercado de Puerto Rico que dicho volumen representa;
4. cualquier otro factor que ayude a establecer equitativamente el monto de dicha plusvalía.

(d)**El monto de los beneficios que se hayan obtenido en la distribución de la mercancía o en la prestación de los servicios, según sea el caso, durante los últimos cinco años** o si no llegaren a cinco, cinco veces el promedio de los beneficios anuales obtenidos durante los últimos años, cualesquiera que fuesen.[34]
(Énfasis nuestro)

En _Marina Industrial, Inc. v. Brown Boveri Corporation_, _supra_, expresamos sobre estos factores lo siguiente:

Los factores enumerados son sólo guías para la determinación de la cuantía de los daños y no obligan al tribunal a conceder automáticamente indemnización aplicando todos y cada uno de los factores. El tribunal tiene discreción para aplicar los factores enumerados a la luz de las circunstancias específicas de cada caso conforme la prueba desfilada.[35]

Como en toda acción torticera, y como mencionamos al discutir el primer señalamiento de error levantado, la

---

[34] 10 L.P.R.A. sec. 278b.

[35] _Marina Industrial, Inc. v. Brown Boveri Corporation_, _supra_, pág. 90.

parte que alega haber sufrido daños tendrá el peso de la prueba. La determinación de la cuantía de los daños, que se fijará a base de los factores del antes citado artículo, queda bajo la discreción del tribunal a la luz de los hechos específicos de cada caso y conforme con la prueba desfilada. No se trata de una fórmula matemática, definitiva o de aplicación mecánica, pues no existe una cantidad específica asignada a cada factor. Serán los tribunales los que aprecien la prueba documental, testifical y pericial y así determinarán los daños que correspondan según la prueba demostrada. No obstante, esta determinación tiene como punto de partida los factores guías de la Ley 75, *supra*. Si un distribuidor presenta una acción bajo esta ley, somete prueba sobre los diversos daños sufridos y éstos se encuentran recogidos en varios factores de los enumerados en dicho estatuto, una vez el tribunal sentenciador haya aquilatado la prueba y entendido que éstos fueron sufridos, no vemos razón por la cual no deba concederse la indemnización correspondiente. No surge del estatuto, ni podemos interpretar del espíritu que lo inspiró, que la concesión de ciertos daños, compensables bajo alguno de los factores enumerados, excluyan otros, resarcibles bajo otro criterio. Los daños reconocidos en cada criterio a evaluar por el tribunal sentenciador, no son excluyentes.

En el caso de marras están en discusión el inciso (c), relacionado a la plusvalía y el inciso (d), relativo al

monto de los beneficios que se hayan obtenido de la distribución durante los últimos cinco años, cantidad que corresponde a la pérdida de ingresos.

La plusvalía es uno de los factores a considerar para fijar la cuantía de los daños en una acción bajo la Ley 75, *supra.* Dicha ley no define el concepto de plusvalía, pero éste ha sido definido por reconocidos tratadistas y por este Tribunal en decisiones anteriores. La Real Academia Española define la plusvalía como el "acrecentamiento del valor de una cosa por causas extrínsecas a ella"[36]. En Calvo Mangas v. Aragonés Jiménez[37] definimos la plusvalía como "el valor comercial desarrollado". También, los tratadistas la han definido como la capacidad de un negocio de obtener una ganancia sobre sus activos netos en exceso del rendimiento normal que obtienen otras firmas en la misma línea de negocios.[38]

En el caso de autos, ante esta controversia sobre la alegada duplicación de daños, el Tribunal de Apelaciones decidió que otorgar la partida correspondiente a la pérdida de ingresos, calculada a base de las ganancias de los último cinco (5) años, más la correspondiente a la plusvalía, constituye una duplicidad en la concesión de los daños. Sostuvo que la plusvalía fue computada

---

[36] Diccionario de la Lengua Española, Ed. 20 (1984).

[37] 115 D.P.R. 219, 229 (1984).

[38] Salvador Antonetti Zequeira, La Medida de los Daños Bajo la Ley 75, 58:2 Rev. Jur. U.P.R. 227, 239 (1989).

exclusivamente con las ganancias que en el pasado Proico había obtenido de la venta de productos Dayco y que por lo tanto se estaba concediendo dos veces la misma partida de daños.[39]

Antes de dilucidar si existe o no una duplicación de compensación por los mismos daños, en la situación señalada, es necesario aclarar que para determinar la cuantía de la plusvalía, existen varios métodos aceptados en el campo de la valoración de negocios. Existe el método de capitalización del exceso de ingresos y el de beneficios futuros descontados al presente, ambos reconocidos y frecuentemente utilizados en tal campo.[40] La ley no dispone qué método específico utilizar para calcular la partida de la plusvalía. El informe del perito de Proico incluye una descripción de estos dos métodos, ya que fueron los utilizados para calcular la cuantía de los daños en concepto de plusvalía. El Tribunal de Primera Instancia le dio entera credibilidad y peso a este informe pericial y basándose en él, impuso la cuantía a conceder como indemnización por la partida de daños por concepto de plusvalía. El Tribunal de Apelaciones no entró a dilucidar si el método utilizado por el perito de Proico es el más preciso o el más adecuado para computar la partida en discusión, sino que el utilizar la partida de las ganancias de los últimos cinco años (5) años para computar la

---

[39] Apéndice del recurso de Certiorari, pág. 35.

[40] Salvador Antonetti Zequeira, *supra.*

plusvalía condujo a que se otorgara una doble compensación. Proico arguyó sobre este particular:

> Es cierto que el perito de Proico consideró las ganancias históricas de Proico de los últimos cinco (5) años, pero ello fue solamente para determinar cuál era el margen de ganancia que tenía Proico comparado con el margen de ganancia normal reportado por la industria. En ningún momento, el perito consideró dichas ganancias históricas como parte de la plusvalía.[41]

Surge del informe del perito de Proico que sí se utilizó la partida de ganancias de los últimos cinco (5) años para computar la plusvalía. No obstante, no es correcto el argumento del foro intermedio apelativo de que éste fue el único criterio que se evaluó para el cómputo de la partida sobre plusvalía. Entre los factores se encuentran: ventas de productos Dayco, costo de ventas, ganancia bruta, porciento de ganancia bruta de la industria, ganancia bruta de la industria, gastos que no continúan y exceso de ganancia bruta de productos Dayco sobre la ganancia bruta de la industria.[42] El informe del perito de Proico utiliza un método para computar la plusvalía que es reconocido; concluimos que fue correcta la apreciación que de este informe, como prueba, realizara el Tribunal de Primera Instancia.

---

[41] Alegato de Proico, presentado el 11 de diciembre de 2002. pág. 12.

[42] Véase informe pericial de Proico, anejo 2, Apéndice del Alegato de Dayco, pág. 17.

Nos persuaden y coincidimos con los argumentos de Centro Unido de Detallistas, admitido como amigo de la corte. Dicha entidad enfatiza el criterio que los daños se prueben con certeza razonable y no con meras especulaciones. Añade, en beneficio del distribuidor, que si toda la prueba desfilada demuestra efectivamente el menoscabo de la plusvalía y el cálculo de esta partida se realiza mediante algún método aceptado en el campo de valoración de negocios, la parte afectada debe ser indemnizada según corresponda, por no haber razón para denegar tales daños.

El hecho que la partida en concepto de ganancias de los últimos cinco (5) años, compensable bajo el inciso (d) del Artículo 3, *supra*, sea utilizada para computar la plusvalía, no implica una duplicación de la compensación, pues se trata de partidas distintas. La cantidad de $719,445, concedida en concepto de las ganancias de los últimos cinco (5) años, representa el ingreso futuro dejado de percibir a causa de la terminación o menoscabo del contrato, o sea la pérdida de ingresos. La cantidad de $124,461, en concepto de plusvalía, representa el menoscabo al valor creado a la operación del establecimiento comercial con el desarrollo del mercado de un producto. Es ese valor añadido de un negocio en operación o de un producto que surge del patrocinio del distribuidor o de su esfuerzo, de la lealtad de los clientes o de la mera

localización.[43] Estamos de acuerdo con el planteamiento de la parte peticionaria cuando señala lo siguiente:

> Se trata pues, de un reconocimiento al aumento de valor y al rendimiento, en exceso del rendimiento promedio reportado por la industria para productos similares, que Proico logró crear para la línea de productos Dayco en Puerto Rico durante el período en que fue su distribuidor.[44]

Concluimos que procede la concesión de daños por menoscabo a la plusvalía y por pérdida de ingresos, cuando los hechos del caso lo ameriten y cuando se presente la prueba que apoye el resarcimiento de ambos tipos de daños. Erró el Tribunal de Apelaciones al eliminar la partida concedida por el Tribunal de Primera Instancia por concepto de plusvalía.

El último error levantado por la parte peticionaria cuestiona la determinación del Tribunal de Apelaciones de no conceder honorarios de abogado, por entender que el recurrido no incurrió en conducta temeraria.

La Regla 44.1 de Procedimiento Civil[45] provee para la concesión de costas y para la imposición de honorarios de abogado. Respecto a los honorarios de abogado dispone lo siguiente:

---

[43] Rudolf Callmann, <u>Unfair Competition, Trademarks & Monopolies</u>, 4ta. ed, Massachusetts, Publicaciones West, 1981, Vol.1, págs. 1:57-1:68; Salvador Antonetti Zequeira, *supra,* pág. 239.

[44] Alegato de Proico, *supra,* pág. 13.

[45] 32 L.P.R.A. Ap. III R. 44.1.

> En caso que cualquier parte o su abogado haya procedido con temeridad o frivolidad, el tribunal deberá imponerle en su sentencia al responsable el pago de una suma por concepto de honorarios de abogado que el tribunal entienda correspondan a tal conducta.

La regla no define lo que constituye conducta temeraria; pero esta Curia ha expresado que "la temeridad es una actitud que se proyecta sobre el procedimiento y que afecta el buen funcionamiento y la administración de la justicia"[46]. También hemos resuelto, que constituye conducta temeraria el que una parte haga necesario un pleito que pudo evitarse o interponga pleitos frívolos y así obligue a la otra parte a incurrir en gastos innecesarios. [47] En Fernández v. San Juan Cement Co., *supra*, señalamos, a manera de ejemplo, situaciones que hemos considerado como conducta temeraria. Sobre esos extremos expresamos lo siguiente:

> Hemos resuelto que existe temeridad si el demandado contesta una demanda y niega su responsabilidad total, aunque la acepte posteriormente; si se defiende injustificadamente de la acción; si la parte demandada en efecto cree que la cantidad reclamada es exagerada y esa es la única razón que tiene para oponerse a las peticiones del demandante y no admite francamente su responsabilidad limitando la controversia a la fijación

---

[46] Jarra Corp. V. Axxis Corp.,155 D.P.R.___(2001), 2001 J.T.S. 167, 491; Oliveras, Inc. v. Universal Ins. Co., 141 D.P.R. 900, 935 (1996).

[47] Domínguez v. GA Life, 157 D.P.R.___ (2002), 2002 J.T.S. 110; Rivera v. Tiendas Pitusa, Inc., 148 D.P.R. 695 (1999); Fernández v. San Juan Cement Co., 118 D.P.R. 713 (1987).

> de la cuantía a ser concedida; si se arriesga a litigar un caso del que se desprendía prima facie la negligencia. (...) Negar un hecho que le consta es cierto al que hace la alegación, también constituye temeridad.[48]

Una vez el tribunal sentenciador concluye que una parte ha sido temeraria, es imperativo la imposición de honorarios de abogado[49]. La determinación de si una parte ha actuado o no con temeridad descansa en la discreción del tribunal[50]. Por lo cual, debido a que tal determinación es un asunto discrecional del tribunal sentenciador, los tribunales revisores intervendrán cuando surja de tal actuación un claro abuso de discreción.[51]

El imponer honorarios de abogado persigue penalizar a aquel litigante perdidoso que por su obstinación, terquedad, contumacia e insistencia en una actitud desprovista de fundamentos, obliga a la otra parte, innecesariamente, a asumir las molestias, gastos, trabajo e inconvenientes de un pleito.[52]

En el caso de marras, el Tribunal de Apelaciones entendió que el aquí recurrido, Dayco, no actuó de forma

---

[48] Fernández v. San Juan Cement Co., *supra*, pág. 719.

[49] Rivera v. Tiendas Pitusa, Inc., *supra*, pág. 702; Montañez Cruz v. Metropolitan Cons. Corp., 87 D.P.R. 38, 39-40 (1962).

[50] Ramirez Anglada v. Club Cala de Palmas, 123 D.P.R. 339, 349 (1989); Fernández v. San Juan Cement Co.,*supra*.

[51] Jarra Corp. V. Axxis Corp.,*supra*.

[52] Domínguez v. GA Life, *supra*; Rivera v. Tiendas Pitusa, Inc., *supra*.

terca, frívola u obstinada, pues su litigación se limitó a defender sus derechos e intereses.

Concluimos que no hubo abuso de discreción por parte del Tribunal de Primera Instancia al decidir no imponer honorarios de abogado y que por lo tanto fue correcta la decisión del Tribunal de Apelaciones de no intervenir con tal decisión. El tercer error levantado no fue cometido.

### III

Por los fundamentos antes expuestos, se revoca la sentencia recurrida, emitida por el Tribunal de Apelaciones, a los fines de reinstalar las determinaciones originales del Tribunal de Primera Instancia sobre la concesión de compensación a Proico por concepto de menoscabo al contrato no exclusivo de productos automotrices, así como la partida concedida a esa parte por concepto de plusvalía. Se confirma en cuanto a todos sus demás extremos.

EFRAIN E. RIVERA PEREZ
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Puerto Rico Oil Company, Inc.

    Demandante Peticionario

          v.                CC-2002-427

Dayco Products, Inc.

    Demandado Recurrido


SENTENCIA


San Juan, Puerto Rico, a 19 de abril de 2005.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se revoca la sentencia recurrida, emitida por el Tribunal de Apelaciones, a los fines de reinstalar las determinaciones originales del Tribunal de Primera Instancia sobre la concesión de compensación a Proico por concepto de menoscabo al contrato no exclusivo de productos automotrices, así como la partida concedida a esa parte por concepto de plusvalía. Se confirma en cuanto a todos sus demás extremos.

Lo acordó el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Rebollo López no intervino.


Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo