ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL[1]

| EAGLE EYE DISASTER RELIEF, LLC<br><br>APELANTE<br><br>V.<br><br>EXCEL CONTRACTORS, LLC F/K/A EXCEL CONTRACTORS INC.<br><br>APELADO | KLAN202201047 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de San Juan<br><br>Caso Núm.: SJ2019CV12037<br><br>Sobre: Incumplimiento de Contrato Cobro de Dinero |
|---|---|---|

Panel integrado por su presidenta, la Jueza Ortiz Flores, la Jueza Romero García y el Juez Rivera Torres

Ortiz Flores, Jueza Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 30 de enero de 2023.

Comparece ante nosotros Eagle Eye Disaster Relief, LLC (Eagle Eye; apelante) mediante el presente recurso de apelación y nos solicita que revoquemos, tanto la *Sentencia* como la *Resolución*, emitidas por el Tribunal de Primera Instancia, Sala Superior de San Juan (TPI), el 3 de marzo de 2022,[2] y el 19 de noviembre de 2022,[3] respectivamente.

Adelantamos que, por los fundamentos que exponemos a continuación confirmamos los dictámenes apelados.

**I**

Por los hechos que se detallan a continuación, el 20 de noviembre de 2019, Eagle radicó *Demanda* en contra de Excel Contractors, LLC f/k/a Excel Contractors, Inc. (Excel; demandada; apelada) por incumplimiento contractual.[4] Lo anterior, a base del documento titulado "Master Service Agreement for Excel Subcontractors" (Subcontrato) suscrito entre Excel y Egle Eye (las partes), para que esta última realizara los trabajos del

---

[1] Conforme OAJP2021-086.
[2] Notificada el 4 de marzo de 2022.
[3] Notificada el 21 de noviembre de 2022.
[4] Apéndice del recurso, pág. 1.

Programa "Sheltering and Temporary Essential Power" (Programa STEP).[5]

El referido acuerdo tuvo lugar, posterior al *Contrato para Trabajos de Reparación de Construcción de conformidad con el Programa de Refugio y Poder Esencial Temporal* (Contrato) entre Excel y el Departamento de la Vivienda de Puerto Rico, suscito el 16 de enero de 2018.[6] El propósito de este Contrato fue realizar la reparación de viviendas de familias puertorriqueñas que se afectaron por el paso del Huracán María, mediante el Programa STEP.[7]

Luego de varios trámites procesales, el 22 de septiembre de 2020, Eagle Eye presentó *Moción para que se dicte Sentencia Sumaria Parcial por Incumplimiento de Contrato en contra de Excel Contractors*,[8] un *Memorandum de Eagle en Apoyo a Moción de Sentencia Sumaria Parcial por Incumplimiento de Contrato*,[9] y una *Declaración de Hechos Esenciales y Pertinentes en apoyo de Moción de Sentencia Sumaria por Incumplimiento de Contrato*.[10] La alegación de Eagle Eye consistió en que Excel le debía cierta cantidad por concepto de retrasos en los pagos, según establecido en la Sección 5 del Subcontrato.

En específico, la demandante adujo que conforme a la Sección antes indicada, Excel debía emitir dos pagos a Eagle Eye para cubrir el monto de cada factura. El primer pago debía efectuarse dentro de 15 días y el segundo, dentro de 45 días, ambos términos contados a partir de que Eagle Eye presentara una factura.[11] Sin embargo, la demandante señaló que, a pesar de lo acordado, Excel pagó de forma tardía ambos pagos, incurriendo así en incumplimiento contractual. A esos efectos, Eagle Eye solicitó que se le impusiera a Excel la penalidad de $100 por cada día de atraso en el pago de las facturas, según se había establecido en la referida Sección 5.

---

[5] *Id.*, a la pág. 65.
[6] *Id.*, a la pág. 21.
[7] *Id.*, a la pág. 22.
[8] *Id.*, a la pág. 165.
[9] *Id.*, a la pág. 261.
[10] *Id.*, a la pág. 271.
[11] *Id.*, a la pág. 263.

Consecuentemente, Excel presentó *Oposición a Moción de Sentencia Sumaria Parcial por Incumplimiento de Contrato*.[12] La apelada trajo a la atención del tribunal una cláusula suspensiva contenida en la referida Sección 5 del Subcontrato, razón por la cual, los pagos emitidos a Eagle Eye no se efectuaron tardíamente. Por otro lado, Excel también radicó *Moción de Sentencia Sumaria* en la cual alegó que por no existir hechos materiales en controversia procedía desestimar la demanda.[13]

Luego de los trámites de rigor, el TPI emitió la *Sentencia* apelada en la cual declaró "**NO HA LUGAR** la *Moción para que se dicte Sentencia Sumaria Parcial por Incumplimiento de Contrato en contra de Excel Contractors*, *Memorandum de Eagle Eye en apoyo a Moción de Sentencia Sumaria Parcial por Incumplimiento de Contrato* y *Declaración de Hechos Esenciales y Pertinentes en apoyo de Moción de Sentencia Sumaria Parcial por Incumplimiento de Contrato* presentado por Eagle Eye", y declaró "**HA LUGAR** la *Moción de Sentencia Sumaria* presentada por Excel".[14] Por lo anterior, el TPI desestimó la demanda enmendada.

El 14 de marzo de 2022, Excel presentó una *Moción de Reconsideración sobre Sentencia*[15] en la que expuso que aun cuando el TPI declaró ha lugar su Moción de Sentencia Sumaria y desestimó la demanda de Eagle Eye, el TPI no realizó la imposición de costas ni de honorarios a Eagle Eye. Por lo anterior, Excel procedió a fundamentar nuevamente su reclamo a los fines que se reconsidere la sentencia, "en aras de imponer costas y honorarios de abogado a [Eagle Eye] en las cuantías establecidas en el *Memorando de Costas*[16] radicado [el 14 de marzo de 2022 ante el TPI, conjuntamente con la moción de reconsideración]."

---

[12] *Id.*, a la pág. 274.
[13] Se toma conocimiento del expediente electrónico del caso civil número SJ2019CV12037 en el Sistema Unificado de Manejo y Administración de Casos (SUMAC), Entrada Núm. 50.
[14] Apéndice del recurso, pág. 381.
[15] SUMAC, Entrada Núm. 79.
[16] SUMAC, Entrada Núm. 80.

El 22 de marzo de 2022, Eagle Eye presentó su *Oposición a moción de reconsideración sobre sentencia y memorando de costas*.[17] Asimismo, Excel presentó, el 23 de marzo de 2022, una moción de réplica con relación a la moción en oposición presentada por Eagle Eye.[18] Antes de proceder a resolver lo anterior, el TPI emitió una *Orden*, el 28 de abril de 2022, mediante la cual concedió 10 días a Eagle Eye para presentar una dúplica, de estar interesado en ello. Transcurrido este término, el asunto quedaría sometido.[19]

Aún pendiente el asunto anterior, Eagle Eye acudió ante este Tribunal mediante un recurso de apelación, ocasión en que emitimos *Sentencia* para desestimar por prematuro. Consecuentemente, instruimos al apelante a presentar un nuevo recurso, una vez resuelta la *Moción de Reconsideración* por el TPI.[20] Devuelto el caso al foro primario, el Tribunal emitió *Resolución* el 19 de noviembre de 2022, notificado a las partes el 21 del mismo mes y año, la cual dispuso lo siguiente:

> Atendida la solicitud de costas y honorarios, así como la oposición y la réplica a la misma, este tribunal resuelve que toda vez que las partes pactaron en el contrato que de tener que llegar al tribunal la parte que prevaleciere tenía derecho a recibir las costas y una suma razonable de honorarios de abogado procede la imposición de los mismos. Sin embargo, atendida la moción de costas y honorarios se declara ha lugar [las costas]. En cuanto a los honorarios, considerando que el desglose de las gestiones no incluye las horas invertidas, ni la tarifa por hora, considerando además la cuantía por honorarios incluida en la oferta de sentencia se establecen los honorarios de abogado en $25,000.00.
>
> Por lo que se ordena a la parte demandante a pagar al demandado $25,090.00.

Inconforme con la determinación del TPI, el apelante acude ante nosotros, a través del presente recurso de apelación y nos señala la comisión de los siguientes errores:

> **Primer error**: Erró el Tribunal de Primera Instancia al concluir que bajo el contrato entre Eagle Eye y Excel "Prime Contractor" se refiere al Departamento de la Vivienda y no a Excel.

---

[17] SUMAC, Entrada Núm. 82.
[18] SUMAC, Entrada Núm. 83.
[19] SUMAC, Entrada Núm. 85.
[20] Véase, *Sentencia* emitida el 2 de junio de 2022 en el caso KLAN202200242.

**Segundo error**: Erró el Tribunal de Primera Instancia al declarar con lugar [la] moción de sentencia sumaria de Excel saliéndose de los parámetros del contrato y levantando una cláusula suspensiva e inexistente. (No se cometió este error.)

**Tercer error**: Erró el Tribunal de Primera Instancia al imponer $25,090 en costas y honorarios a Eagle Eye bajo la Regla 35.1 de las de Procedimiento Civil de Puerto Rico.

Con el beneficio de los escritos de ambas partes, procedemos a resolver el recurso ante nuestra consideración.

**II**

**A**

El Artículo 1042 del Código Civil de 1930,[21] hoy derogado, atendía lo relativo a las fuentes de obligaciones. En lo pertinente, la citada disposición legal establecía que las obligaciones nacían –y nacen– "de la ley, de los contratos y cuasicontratos, y de los actos y omisiones ilícitos en que intervenga cualquier género de culpa o negligencia." 31 LPRA sec. 2992.[22] Asimismo, el Artículo 1044 disponía que, "[l]as obligaciones que nacen de los contratos tienen fuerza de ley entre las partes contratantes". 31 LPRA sec. 2994. En armonía con lo anterior, el principio de *pacta sunt servanda* establece la obligatoriedad del contrato según sus términos y las consecuencias necesarias derivadas de la buena fe. *BPPR v. Sucn. Talavera*, 174 DPR 686, 693 (2008).

Por otro lado, el Código Civil de 1930, disponía en su Artículo 1206, que "[e]l contrato existe desde que una o varias personas consienten en obligarse respecto de otra u otras, a dar alguna cosa, o prestar algún servicio." 31 LPRA sec. 3371. A su vez, un contrato se concretiza cuando concurren los siguientes requisitos: consentimiento de los contratantes; el objeto cierto; y la causa de la obligación. Artículo 1213 del Código Civil, 31 LPRA sec. 3391. En todo caso, "[l]os contratos se perfeccionan por el mero consentimiento, y desde entonces obligan, no sólo al cumplimiento de lo

---

[21] El Código Civil de 1930 fue derogado por Ley Núm. 55 del 1 de junio de 2020, 31 LPRA sec. 5311 *et seq.*, vigente desde el 28 de noviembre de 2020. No obstante, a los hechos del presente caso le es aplicable el ordenamiento jurídico anterior. Véase, Artículo 1812 del Código Civil de 2020, 31 LPRA sec. 11717.

[22] Análogo al Artículo 1063 del Código Civil de 2020, 31 LPRA sec. 8984.

expresamente pactado, sino también a todas las consecuencias que según su naturaleza sean conformes a la buena fe, al uso y a la ley." Art. 1210 del Código Civil, 31 LPRA sec. 3375.

En nuestro ordenamiento jurídico rige el principio de la autonomía de la voluntad el cual le concede amplia libertad de acción a las partes que desean obligarse. *BPPR v. Sucn. Talavera*, 174 DPR, a la pág. 693. La aludida norma está recogida por el Artículo 1207 del antiguo Código Civil, el cual disponía de la siguiente forma: "Los contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarios a las leyes, a la moral, ni al orden público." 31 LLPRA sec. 3372; *Álvarez de Choudens v. Rivera Vázquez*, 165 DPR 1, 17 (2005), que cita a *Irizarry López v. García Cámara*, 155 DPR 713, 724 (2001).

Estas normas reconocen un doble postulado en la teoría general de los contratos. Por un lado la libertad de contratación, y del otro, la total autonomía de la voluntad de los contratantes que han escogido obligarse mutuamente para determinar el contenido de dicha relación jurídica. Dicha autonomía está limitada únicamente por los parámetros que impongan la ley, la moral social y el orden público. De tal forma, una vez los contratantes eligen pactar entre sí, estos pueden establecer el contenido y alcance normativo de su relación jurídica, sin otra intromisión del Estado que la impuesta por los criterios antes mencionados. Por lo tanto, los tribunales de justicia no pueden relevar a una parte de cumplir con lo que se obligó a hacer mediante un contrato, cuando el mismo es legal y válido. *De Jesús González v. A.C.*, 148 DPR 255, 271 (1999), que cita a *Cervecería Corona v. Commonwealth Ins. Co.*, 115 DPR 345 (1984); *Olazábal v. U.S. Fidelity, etc.*, 103 DPR 448, 462 (1975).

De otra parte, el Artículo 1233 del Código Civil de 1930, 31 LPRA sec. 3471, disponía que, si los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes, se estará al sentido literal de sus cláusulas. Sin embargo, de surgir controversia sobre "la voluntad o

intención de los contratantes con la mera lectura literal de las cláusulas contractuales, deberá recurrirse a evidencia extrínseca para juzgarla, utilizando principalmente los actos anteriores, coetáneos y posteriores de los contratantes, el uso o costumbre y demás circunstancias indicativas de la intención contractual, incluyendo la ocasión, las circunstancias, las personas y el acuerdo que se intentó llevar a cabo." Artículos 1234 y 1239 del Código Civil, 31 LPRA secs. 3472 y 3477; Nissen *Holland v. Genthaller*, 172 DPR 503, 518-519 (2007), que cita a *Municipio Mayagüez v. Lebrón*, 167 DPR 713 (2006); *S.L.G. Irizarry v. S.L.G. García*, 155 DPR 713 (2001).

Particularmente, los Artículos 1233 y 1235 al 1237 del Código Civil de 1930, 31 LPRA secs. 3471, 3473-3475, establecían lo siguiente:

> Si los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes, se estará al sentido literal de sus cláusulas.

> Si las palabras parecieren contrarias a la intención evidente de los contratantes, prevalecerá esta sobre aquellas.
> [...]

> Cualquiera que sea la generalidad de los términos de un contrato, no deberán entenderse comprendidos en él cosas distintas y casos diferentes de aqu[e]llos sobre que los interesados se propusieron contratar.

> Si alguna cláusula de los contratos admitiere diversos sentidos, deberá entenderse en el más adecuado para que produzca efecto.

> Las cláusulas de los contratos deberán interpretarse las unas por las otras, atribuyendo a las dudosas el sentido que resulte del conjunto de todas.

El mencionado Artículo 1233 del Código Civil regulaba la forma en que los tribunales debían interpretar un contrato cuando el significado de sus términos estaba en disputa. Cónsono con esta norma –aún vigente– los tribunales debemos hacer valer el contrato en su sentido literal, a menos que haya palabras contrarias a la intención evidente de las partes. Sobre este particular, el Tribunal Supremo de Puerto Rico ha expresado lo siguiente:

> En reiteradas ocasiones hemos sostenido que si los términos, las condiciones y las exclusiones de un contrato [...] son claros, específicos y libres de ambigüedades, se hará valer la clara voluntad de los contratantes. Los términos de un contrato son claros cuando 'por sí mismos son bastante

lúcidos para ser entendidos en un único sentido, sin dar lugar a dudas, controversias ni diversidad de interpretaciones y sin necesitar para su comprensión razonamientos o demostraciones susceptibles de impugnación.'[23] **En ausencia de ambigüedad, las cláusulas del contrato son obligatorias pues no se admitirá una interpretación que vulnere el claro propósito y voluntad de las partes**. (Énfasis nuestro.) *S.L.G. Francis-Acevedo v. SIMED*, 176 DPR 372, 387 (2009).

En consecuencia, si el grado de claridad del contrato es tal que solamente es posible atribuirle un significado, debemos abstenernos de hacer otra interpretación que sea ajena a la intención de las partes contratantes. Finalmente, con relación a la interpretación de los contratos, el Artículo 1237 del Código Civil de 1930 establecía que: "Las cláusulas de los contratos [han] interpretarse las unas por las otras, atribuyendo a las dudosas el sentido que resulte del conjunto de todas." 31 LPRA sec. 3475.

**B**

Como norma general, será exigible toda obligación, "cuyo cumplimiento no dependa de un suceso futuro o incierto, o de un suceso pasado, que los interesados ignoren." Artículo 1066 del Código Civil de 1930, 31 LPRA sec. 3041 (derogado). Ahora bien, conforme al Artículo 1067 del derogado Código Civil, "[e]n las obligaciones condicionales la adquisición de los derechos, así como la resolución o pérdida de los ya adquiridos, dependerá del acontecimiento que constituya la condición." 31 LPRA sec. 3042. Estas obligaciones se caracterizan por la incertidumbre de si el vínculo jurídico adquirirá eficacia o la perderá por no cumplirse un hecho futuro e incierto, o del conocimiento de un hecho pasado, cuya ocurrencia se desconocía. J. Puig Brutau, *Fundamentos de Derecho Civil*, 4ta ed. rev., Barcelona, Ed. Bosch, 1985, T. I, Vol. II, pág. 84.

Las obligaciones condicionales pueden ser suspensivas o resolutorias. Las suspensivas "tienen la particularidad de que su eficacia depende de que se cumpla un hecho futuro e incierto." *Jarra Corp. v. Axxis Corp.*, 155 DPR 764, 773 (2001). De tal modo, si se cumple esa condición cobra eficacia la obligación, y si no se cumple, las partes quedan liberadas.

---

[23] En una cita a *Sucn. Ramírez v. Tribl. Superior*, 81 DPR 357, 361 (1959).

*Id.* De otra parte, nuestro más alto foro ha resuelto que, las obligaciones sujetas a una condición suspensiva quedaran extinguidas de no cumplirse la condición, por lo que, no se pueden exigir las prestaciones hasta tanto esta se haya cumplido. *Id.*, que cita a *Mercedes Bus Line v. Rojas*, 70 DPR 540 (1949); *Meléndez v. Jiménez Realty, Inc.*, 98 DPR 892 (1970).

De igual forma, el efecto de la condición va a depender del tipo de obligación que se trate, ya sea de dar, hacer o no hacer. Véase, Artículo 1073 del Código Civil, 31 LPRA sec. 3048 (derogado). Concretamente, en una interpretación del artículo anterior, nuestro Tribunal Supremo expresó lo siguiente:

> En cuanto a las obligaciones de dar, una vez cumplida la condición, los efectos de la obligación se retrotraen al día de su constitución. En cuanto a las obligaciones de hacer o no hacer, la retroactividad será consecuencia, en cada caso, de un dictamen judicial. *López v. González*, 163 DPR 275, 283 (2004).

Como resultado, si la condición se cumple, surge la obligación, y por el contrario, si no ocurre, "'el vínculo de derecho no llega a aparecer'." *López v. González*, 163 DPR, a la pág. 283, que cita a *Meléndez v. Jiménez Realty, Inc.*, 98 DPR, a la pág. 897.

**C**

En nuestro ordenamiento jurídico el mecanismo de sentencia sumaria se rige por la Regla 36 de Procedimiento Civil, 32 LPRA Ap. V, R. 36 (Regla 36). La norma procesal dispone que, para poder adjudicar en los méritos una moción de sentencia sumaria, lo que se requiere es que se presente "una moción fundada en declaraciones juradas o en aquella evidencia que demuestre la inexistencia de una controversia sustancial de hechos esenciales y pertinentes, para que el tribunal dicte sentencia sumariamente" ya sea sobre la totalidad de la reclamación o parte de esta. Regla 36.

Quien promueve la sentencia sumaria "**debe demostrar que no existe controversia sustancial o real en cuanto a algún hecho material, es decir, en cuanto a ningún componente de la causa de acción**". (Énfasis nuestro.) *Meléndez González v. M. Cuebas*, 193 DPR 100, 110

(2015). Un hecho material "es aqu[e]l que puede afectar el resultado de la reclamación de acuerdo con el derecho sustantivo aplicable". J. A. Cuevas Segarra, *Tratado de Derecho Procesal Civil*, Publicaciones JTS, 2011, Tomo III, en la pág. 1041. Por otra parte, quien se opone a una sentencia sumaria debe presentar, a su vez, documentos y declaraciones que contradigan los hechos presentados por el promovente. *Rivera et al. v. Superior Pkg., Inc. et al.*, 132 DPR 115, 133 (1992). Es decir, la parte opositora viene obligada a contestar de forma detallada la solicitud de sentencia sumaria.

Ahora bien, el mecanismo procesal de la sentencia sumaria es un remedio de carácter extraordinario y discrecional. *Sucn. Maldonado v. Sucn. Maldonado*, 166 DPR 154, 184 (2005). Tiene como finalidad "propiciar la solución justa, rápida y económica de litigios civiles que no contengan controversias genuinas de hechos materiales". *Const. José Carro v. Mun. Dorado*, 186 DPR 113, 128 (2012). Por lo dicho, "'[e]l sabio discernimiento es el principio rector para su uso porque, mal utilizada, puede prestarse para despojar a un litigante de 'su día en corte', principio elemental del debido proceso de ley'." *Mgmt. Adm. Servs. Corp. v. E.L.A.,* 152 DPR 599, 611 (2000), que cita a *Roig Com. Bank v. Rosario Cirino*, 126 DPR 613, 617 (1990).

Siendo esto así, sólo procede que se dicte la sentencia sumaria "cuando surge de manera clara que, ante los hechos materiales no controvertidos, el promovido no puede prevalecer ante el derecho aplicable y el tribunal cuenta con la verdad de todos los hechos necesarios para poder resolver la controversia". *Meléndez González v. M. Cuebas*, 193 DPR, a las págs. 109-110, que cita a *Const. José Carro v. Mun. Dorado*, 186 DPR, a la pág. 129. De haber alguna duda acerca de la existencia de una controversia sobre los hechos medulares y sustanciales del caso, deberá resolverse contra la parte que solicita la moción, haciendo necesaria la celebración de un juicio. *Rivera et al. v. Superior Pkg., Inc. et al.*, 132 DPR, a la pág. 133.

Según se ha establecido jurisprudencialmente, como tribunal intermedio, nos encontramos en la misma posición que el Tribunal de Primera Instancia al determinar si procede o no una sentencia sumaria. Por lo cual, nuestra revisión es *de novo* y debemos examinar el expediente de la manera más favorable hacia la parte que se opuso a la resolución sumaria en el foro primario, llevando a cabo todas las inferencias permisibles a su favor. *Meléndez González v. M. Cuebas*, 193 DPR, a la pág. 118.

Sin embargo, al evaluar la determinación del tribunal *a quo*, estamos limitados de dos maneras: (1) **sólo podemos considerar los documentos que se presentaron ante el TPI**; y (2) **únicamente podemos determinar si existe o no alguna controversia genuina de hechos materiales y esenciales, y si el derecho se aplicó de forma correcta**. Es decir, que no estamos facultados para adjudicar los hechos materiales esenciales en disputa. *Vera v. Dr. Bravo*, 161 DPR 308, 334-335 (2004). El deber de adjudicar los hechos materiales y esenciales es una tarea que le compete al Tribunal de Primera Instancia y no al foro revisor. En *Meléndez González et al. v. M. Cuebas*, 193 DPR, a la pág. 118, el Tribunal Supremo dispuso, además, que debemos revisar que, tanto la solicitud de sentencia sumaria como su oposición, cumplan con los requisitos de forma codificados en la Regla 36 de Procedimiento Civil y la jurisprudencia pertinente.

Por último, de encontrar que los hechos esenciales están realmente incontrovertidos, entonces, debemos revisar si el Tribunal de Primera Instancia aplicó el Derecho de forma correcta a los hechos del caso. *Meléndez González et al. v. M. Cuebas*, 193 DPR, a la pág. 119.

**D**

La Regla 44.1 de Procedimiento Civil, 32 LPRA Ap. III, R. 44.1, permite la imposición de honorarios en caso de que cualquiera de las partes, o su abogado, procedan con temeridad o frivolidad. En su parte pertinente, el inciso (d) de la mencionada norma establece lo siguiente: "En caso [de] que cualquier parte o su abogado o abogada haya procedido con

temeridad o frivolidad, **el tribunal deberá imponerle en su sentencia al responsable el pago de una suma por concepto de honorarios de abogado que el tribunal entienda correspondan a tal conducta**." 32 LPRA Ap. V, R. 44.1 (d). (Énfasis nuestro.)

Nuestro Tribunal Supremo ha definido el concepto de temeridad "como aquella conducta que hace necesario un pleito que se pudo evitar, que lo prolonga innecesariamente o que obliga que la otra parte incurra en gestiones evitables." *Marrero Rosado v. Marrero Rosado*, 178 DPR 476, 504 (2010). Cabe señalar que esta misma conducta se toma en cuenta tanto para la imposición de honorarios de abogado al amparo de la Regla 44.1 (d) de Procedimiento Civil, como para la imposición del interés legal por temeridad al amparo de la Regla 44.3 (b) de Procedimiento Civil, 32 LPRA Ap. V, R. 44.3 (b). Según lo ha expresado el Tribunal Supremo, "[a]mbas penalidades persiguen el mismo propósito de disuadir la litigación frívola y fomentar las transacciones mediante sanciones que compensen a la parte victoriosa los perjuicios económicos y las molestias producto de la temeridad de la otra parte." 178 DPR, a la pág. 505.

El propósito de la imposición de honorarios por temeridad es penalizar a la parte perdidosa "que por su terquedad, obstinación, contumacia e insistencia en una actitud desprovista de fundamentos, obliga a la otra parte, innecesariamente, a asumir las molestias, gastos, trabajo e inconveniencias de un pleito." *Rivera v. Tiendas Pitusa, Inc.*, 148 DPR 695, 702 (1999). La determinación de si una parte obró con temeridad descansa en la sana discreción del tribunal sentenciador. *P.R. Oil v. Dayco*, 164 DPR 486, 511 (2005). La imposición del pago de honorarios de abogado es imperativa cuando el tribunal sentenciador concluye que una parte incurrió en temeridad. *Id.* Además, debemos señalar que la norma es que "[e]n ausencia de una conclusión expresa a tales efectos, un pronunciamiento en la sentencia condenando al pago de honorarios de abogado, implica que el tribunal sentenciador consideró temeraria a la parte así condenada." *Montañez Cruz v. Metropolitan Cons. Corp.*, 87 DPR 38, 39-40, (1962). Es

decir, no es necesaria una determinación expresa de temeridad si el foro sentenciador impuso el pago de una suma por honorarios de abogado en su sentencia. Por constituir un asunto discrecional del tribunal sentenciador, los tribunales revisores solo intervendremos en dicha determinación cuando surja que un claro abuso de discreción. 164 DPR, a la pág. 511, que cita a *Jarra Corp. v. Axxis Corp.*, 155 DPR, a la pág. 779.

Sin embargo, es importante aclarar que se entiende que no existe temeridad cuando lo que se presenta ante el foro primario son planteamientos complejos y novedosos que no han sido resueltos en nuestra jurisdicción. *Santiago v. Sup. Grande*, 166 DPR 796, 821 (2006). De igual manera, "[no] existe temeridad en aquellos casos en que el litigante actúa de acuerdo con la apreciación errónea de una cuestión de derecho y no hay precedentes establecidos sobre la cuestión." *Id.*, que cita a *Cabanilla v. Gelpí*, 65 DPR 945, 949 (1946). Tampoco se incurre en temeridad "cuando existe alguna desavenencia honesta en cuanto a quién favorece el derecho aplicable a los hechos del caso." 166 DPR, a la pág. 821, que cita a *Cándido, Inc. V. Universal Ins. Co.*, 141 DPR 900, 936 (1996).

Por otra parte, la Regla 35.1 de las de Procedimiento Civil, 32 LPRA Ap. V, R. 35.1, contempla otro escenario en el que proceden los honorarios de abogado. Al respecto, la citada disposición legal establece lo siguiente:

> En todo caso en que la sentencia que obtenga finalmente la parte a quien se le hizo la oferta sea igual o menos favorable, ésta tendrá que pagar las costas, los gastos y los honorarios de abogado incurridos con posterioridad a la oferta.

La referida norma, provee un mecanismo a la parte demandante para que esta pueda recibir una compensación, en un pleito en cual quizás no hubiese recibido nada, al momento de su disposición. Por otro lado, esta brinda un mecanismo dual a la parte demandada, ya que le permite a esta "librarse de los costos de un pleito, de todos los contratiempos que conlleva este proceso y de poder ser responsabilizada por una suma de dinero mucho mayor a la ofrecida." *Morell Corrada v. Ojeda*, 151 DPR 864, 874 (2000). Igualmente, la citada regla resulta beneficiosa para el sistema

judicial, pues contribuye a la pronta solución de las reclamaciones, de forma que reduce la carga de los tribunales. *Id.* A modo de resumen, la Regla 35.1 dispone un mecanismo para que las partes en el pleito evalúen los riesgos y costos del litigio, y así consideren la posibilidad de transigir las reclamaciones en una etapa previa al juicio. *Id.*

**III**

En el presente recurso, el apelante nos señala que incidió el foro primario al concluir que en el Subcontrato, *"Prime Contractor"* se refiere al Departamento de la Vivienda, y no a Excel. Además, que el TPI erró al declarar con lugar la moción de sentencia sumaria de Excel, al amparo de "una cláusula suspensiva inexistente". Por último, Eagle Eye aduce como tercer error que, el TPI no debió imponerle $25,090.00 por concepto de costas y honorarios de abogado, bajo la Regla 35.1 de las de Procedimiento Civil de Puerto Rico.[24] No tiene razón. Veamos.

A la luz del marco jurídico antes esbozado, al revisar una denegatoria o concesión de una moción de sentencia sumaria, lo primero que debemos examinar es, si dicha moción, al igual que su oposición, obedecieron los requisitos dispuestos en la Regla 36 de Procedimiento Civil. *Meléndez González v. M. Cuebas*, 193 DPR, a la pág. 118. En el presente caso, luego de evaluar las mociones y sus respectivas oposiciones, resolvemos que ambas cumplieron con los requisitos de forma dispuestos en la Regla 36.

En segundo lugar, nos corresponde evaluar si en realidad existen hechos materiales en controversia, y cuáles están incontrovertidos. *Meléndez González v. M. Cuebas*, 193 DPR, a la pág. 118. Del expediente ante nuestra consideración surge que, en mayo de 2018 Excel y Eagle Eye suscribieron un acuerdo, entiéndase, el Subcontrato objeto de interpretación ante el foro primario.[25] A través de dicho documento, Eagle

---

[24] Escrito de Apelación, pág. 4.
[25] Apéndice del recurso, pág. 65.

Eye se obligó a realizar los trabajos del Programa STEP, a cambio de una remuneración ascendiente a dos millones de dólares ($2,000,000.00).[26]

Finalizadas las obras para las cuales Eagle Eye fue contratada, inclusive, luego de haber recibido los pagos, según las facturas emitidas a Excel, la apelante presentó la *Demanda* de epígrafe para reclamar una cuantía adicional por concepto de penalidades por alegados atrasos en los pagos. Además, en su demanda exigió que Excel le pagara el 5% de retención, según establecido en el Subcontrato.[27] Luego de evaluar las mociones de las partes, y los documentos que las acompañaron, el TPI procedió a resolver el caso de forma sumaria. Luego de realizar un cuidadoso estudio del expediente del caso, queda meridianamente claro que no existen hechos esenciales en controversia. Por lo cual, sólo nos resta "revisar de *novo* si el Tribunal de Primera Instancia aplicó correctamente el Derecho" a los hechos del caso. *Meléndez González v. M. Cuebas*, 193 DPR, a la pág. 119. En específico, nos corresponde determinar si fue correcto el razonamiento del foro primario respecto a la cláusula número 5 del Subcontrato,[28] la cual incluyó las siguientes disposiciones:

> **PAYMENTS**- If complete, and timely received, EXCEL shall include the approved amounts reflected in Subcontractor's invoice with its next application for payment submitted to the Prime Contractor. Subcontractor will be allowed to bill on the 1st and 15th of every month. If untimely or returned to the Subcontractor for revision, EXCEL shall submit Subcontractor's application with the next application it is entitled to submit to the Prime Contractor following Subcontractor's complete and timely submission. Subject to this Agreement, amounts approved by EXCEL, less retainage and any other amounts Excel is entitled to withhold, shall be made within FIFTEEN (15) days after EXCEL has received invoice billings from the Subcontractor. Subcontractor agrees to receive 50% of their Subcontractor's Schedule of Unit Prices attached as Exhibit 3 (which is 75% of the approved line items for the FEMA STEP Program in Puerto Rico), plus any change orders or deductive change orders. Contractor agrees to pay remaining 50% retainage to the Subcontractor within 45 days of receiving the original invoice for said work orders/ scope of work. The 5% retainage will stay enforced as outlined in section 4 above. Excel will make payment within 15 days after submission from the Subcontractor on the 1st or 15th of every month for the amount of the approved lines items

---

[26] Véase, Apéndice del recurso, pág. 102 y SUMAC, Entrada Núm. 54.
[27] Este asunto no está incluido en el recurso de apelación.
[28] Apéndice del recurso, págs. 67-68.

that the Subcontractor's Schedule of Unit Prices attached as Exhibit 3 has been given. Subcontractors payment/ invoices will be solely base on a Final Site Visit approval in the field (FSV) by the program. After the FSV has passed in the field, then the subcontractor may submit on the corresponding dates above for approved billing days (1st and the 15th of every month). Any quality control process from the program or Contractor after the FSV in the field has been approved, will not impede the ability of the Subcontractor to submit for invoicing as long as the FSV for any approved work order has "PASSED" at the FSV in the field. The subcontractor will make every effort necessary to provide any missing photos or needed documents that are directly related to the scope of work (work order) given to the subcontractor in a timely manner, but the quality control process for the contractor or program will not impede or stop the subcontractor from submitting and getting paid for the work performed on the work orders. Contractor agrees that if payment is not made after the 15 days after submission on the above mentioned and approved billing days, then there will be a 100.00 penalty per day per work order paid from the Contractor to the subcontractor per work order in the invoices submitted for payment. The language used in section 5 exceeds any and all other language in this agreement, not withstanding, any documents needed that the Contractor needs from the Subcontractor for the billing with the program ie. Lien waivers, warranty work, insurance requirements, needed photos and proper invoicing on behalf of the Subcontractor. **Subcontractor agrees that a condition precedent to any and all payments to Subcontractor under this Agreement is EXCEL's receipt of payment from the Prime Contractor**. (Énfasis nuestro.)

En primer lugar, de una lectura de la sección anterior, se desprende que las partes acordaron que Excel pagaría a Eagle Eye en dos periodos de pago diferentes. El primero de estos, a los 15 días y el segundo a los 45 días, a partir de la fecha en que Eagle Eye presentara las facturas por los montos aprobados. De acuerdo con lo establecido en la Sección 5, dichos pagos se debían basar únicamente en un *Final Site Visit Approval* (FSV). Adicional, las partes acordaron imponer una penalidad de cien dólares ($100.00) por cada día de retraso en los pagos, según antes indicado.

Asimismo, se desprende de la aludida cláusula que, previo a surgir la obligación de Excel de emitir los pagos, debía cumplirse una condición suspensiva. En específico, se incluyó la siguiente disposición: "El Subcontratista acepta que una condición previa a cada uno de los pagos al Subcontratista en virtud [del] Acuerdo es que EXCEL reciba el pago del 'Contratista principal'." (Traducción nuestra.)

El apelante señala como primer error que *'Prime Contractor'* se refiere a la propia compañía Excel, y no al Departamento de la Vivienda como concluyó el TPI. No obstante, no nos convence. Tal como señala el apelado en su escrito de oposición,[29] dicha interpretación resulta improcedente, contraria, e ilógica. De la misma forma, lo interpretó el foro primario al resolver que, acoger la postura del apelante "se traduciría a que el pago de Eagle Eye está [condicionado a] que Excel le pague a Excel, conclusión que resulta en un contrasentido."[30] Por tanto, resulta improcedente concluir que *'Prime Contractor'* es el propio Excel. No se cometió el primer error.

Atendido el señalamiento de error anterior, pasemos a discutir el segundo, en cuanto a la condición suspensiva incluida en el Subcontrato. Una lectura de la aludida sección revela que las partes acordaron que, las cantidades aprobadas por Excel, tras realizar las retenciones correspondientes, serían pagadas a Eagle Eye –en dos pagos– dentro de los 15 y 45 días posteriores a que Excel recibiera las facturas de Eagle Eye. Ante un incumplimiento con los periodos establecidos, se activaría una cláusula penal por la cual Excel le pagaría a Eagle Eye cien dólares ($100.00) por cada día de retraso. No obstante, el TPI tuvo la tarea de interpretar la Sección 5 del Subcontrato a los fines de determinar, a partir de qué día comenzaba a transcurrir el término antes indicado, para que se activara la cláusula penal. El foro primario concluyó que ese periodo comenzaba a decursar desde que Excel recibiese el pago por parte del Departamento de la Vivienda, conclusión que resulta razonable a base de los documentos que surgen del expediente. Por lo anterior, resolvemos que Eagle Eye aceptó como condición que, previo a recibir su compensación, primero Excel debía recibir el pago del *'Prime Contractor'*. No se cometió el segundo error.

---

[29] Alegato de oposición a la apelación, págs. 1-2.
[30] Apéndice del recurso, pág. 379, *Sentencia* del TPI.

Nos resta atender el tercer señalamiento de error de Eagle Eye, referente a la imposición de honorarios de abogado. Esto así, ya que el TPI, mediante la *Resolución* emitida el 19 de noviembre de 2022, notificada el 21 del mismo mes y año, impuso al demandante-apelante el pago de $25,090.00 por concepto de costas y horarios de abogado. Lo anterior, "toda vez que las partes pactaron en el [Subcontrato] que de tener que llegar al tribunal la parte que prevaleciera tenía derecho a recibir las costas y una suma razonable de honorarios de abogado".[31]

Especialmente, las partes acordaron en la Sección número 22 del Subcontrato lo siguiente:

> **ENFORCEMENT**- Should either party retain counsel to enforce the terms of this Agreement, the party who substantially prevails in nay dispute shall be paid by the other party **all costs and expenses arising out of or relating to such enforcement (including reasonable attorney's fees)**.

De lo anterior, surge que las partes habían acordado la imposición de costas y honorarios de abogado en caso de tener que litigar algún asunto relativo al Subcontrato. En específico, estas pactaron que la parte perdidosa debía compensar a quien prevaleciera.

Si bien es cierta la alegación del apelante, en cuanto a que la imposición de honorarios de abogado al amparo de la Regla 35.1 procede cuando una parte haya actuado con temeridad, este no es el caso de autos. Véase, *Morell Corrada v. Ojeda*, 151 DPR 864, 881-882 (2000).[32] Esto así, pues de la *Resolución* del foro primario se desprende que al imponer la sanción de costas y honorarios de abogado, el Tribunal consideró la Sección 22 del Subcontrato y no la Regla 35.1 de Procedimiento Civil. Además, cabe mencionar que, contrario a lo que señala el apelante,[33] nuestro Tribunal Supremo ha resuelto que "[e]n ausencia de una conclusión expresa [de temeridad], un pronunciamiento en la sentencia condenando

---

[31] Apéndice del recurso, pág. 399.
[32] El Tribunal Supremo resolvió que la Regla 35.1 de Procedimiento Civil no opera de manera automática en la situación prevista en la misma, de modo que, para imponer honorarios de abogado conforme dicha normativa, no basta que la parte demandante haya rechazado una oferta de transacción que era "más favorable", sino que es necesario una determinación previa de temeridad o arbitrariedad por parte del Tribunal de Primera Instancia.
[33] Escrito de Apelación, págs. 9-10.

al pago de honorarios de abogado, implica que el tribunal sentenciador consideró temeraria a la parte así condenada." *Montañez Cruz v. Metropolitan Cons. Corp.*, 87 DPR, a las págs. 39-40. Es decir, no es necesaria una determinación expresa de temeridad si el foro sentenciador impuso el pago de una suma por honorarios de abogado en su sentencia.

Ahora bien, las partes no acordaron una cuantía en particular por concepto de honorarios de abogado. No obstante, nuestro más alto foro ha establecido que los tribunales pueden tomar en consideración factores tales como, el esfuerzo y actividad profesional desplegada por los abogados, la labor realizada por estos, "la naturaleza del litigio, las cuestiones envueltas, la cuantía en controversia y el tiempo invertido por dichos abogados durante la prolongada duración del caso". *Pan Am v. Tribunal Superior*, 100 DPR 413, 420 (1972); *Serrano Vda. de Cartagena v. Lugo Ramírez*, 83 DPR 300, 303 (1961).

El caso de autos inició en noviembre de 2019. Ha tenido una duración de más de tres (3) años. La parte apelada, expuso una narración detallada de los gastos incurridos en costas y horarios de abogado en su moción titulada *Memorando de Costas*,[34] en la cual solicitó un total de $53,720.00. De acuerdo con los criterios antes establecidos, resolvemos que es razonable la partida de veinticinco mil dólares ($25,000.00) que el TPI impuso al apelante.

Según señalamos antes, la imposición de honorarios de abogado descansa en la sana discreción del foro de instancia. *P.R. Oil v. Dayco*, 164 DPR, a la pág. 511. Por ello, como tribunal revisor, debemos otorgar deferencia a la concesión de esta sanción procesal, que persigue castigar la temeridad y evitar la presentación de causas frívolas. Por tanto, debemos abstenernos de intervenir con la determinación del TPI, toda vez que el apelante no demostró la comisión de error ni una actuación con prejuicio o parcialidad por parte del foro primario.[35]

---

[34] SUMAC, Entrada Núm. 80.
[35] Los foros apelativos no debemos intervenir con el ejercicio de la discreción de los tribunales de primera instancia, "salvo que se demuestre que hubo un craso abuso de discreción, perjuicio, error manifiesto o parcialidad." *Trans-Oceanic Life Ins. v. Oracle*

Cónsono con lo anterior y luego de un sosegado análisis, somos del criterio que no existe nada en el expediente, ni en los argumentos del apelante, que nos lleve a concluir que en el presente caso se cometió algún error que conlleve la revocación de la determinación judicial. Consiguientemente, procede la confirmación del dictamen.

**IV**

Por lo antes expuesto, se confirma ambos dictámenes apelados. Por un lado, la *Sentencia* que declaro **No Ha Lugar** la *Moción para que se dicte Sentencia Sumaria Parcial por Incumplimiento de Contrato en contra de Excel Contractors*, *Memorandum de Eagle Eye en apoyo a Moción de Sentencia Sumaria Parcial por Incumplimiento de Contrato*, y la *Declaración de Hechos Esenciales y Pertinentes en apoyo de Moción de Sentencia Sumaria Parcial por Incumplimiento de Contrato* presentado por Eagle Eye; y que declaró **Ha Lugar** la *Moción de Sentencia Sumaria* presentada por Excel. Asimismo, se confirma la *Resolución* del TPI que impuso las costas y honorarios de abogado al apelante.

**Notifíquese.**

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

---

*Corp.*, 184 DPR 689, 709 (2012), que cita a *Lluch v. España Service Sta.,* 117 DPR 729, 745 (1986).