Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL X

| | | |
|---|---|---|
| KIARA VALDÉS Y/O MANUEL ARROYO TORRES<br><br>Recurridos<br><br><br>V.<br><br><br>CEN REALLTY CORP. Y/O **NSB VEGA BAJA LLC**<br><br>**Recurrente** | TA2025RA00022 | *Revisión de Decisión Administrativa* procedente del Departamento de Asuntos del Consumidor<br><br>Caso Núm.: ARE-2024-0006359<br><br>Sobre: Bienes Raíces (Ley Núm. 10 de 26 de abril de 1994, según enmendada) Ley de la Oficina del Oficial de Construcción (Ley Núm. 130 de 13 de junio de 1967) |

Panel integrado por su presidenta; la Juez Lebrón Nieves, la Jueza Romero García y el Juez Rivera Torres

*Lebrón Nieves, Juez Ponente*

## SENTENCIA

En San Juan, Puerto Rico, a 11 de agosto de 2025.

El 26 de junio de 2025, compareció ante este Tribunal de Apelaciones NSB Vega Baja, LLC, (en adelante NSB Vega Baja o parte recurrente), mediante *Recurso de Revisión Judicial*. En su escrito, nos solicita la revisión de la *Resolución* emitida por el Departamento de Asuntos del Consumidor (en adelante, DACo) el 22 de abril de 2025 y notificada el 24 de abril de 2025. En su dictamen, la agencia declaró CON LUGAR una querella presentada por la Sra. Kiara Valdés (en adelante señora Valdés o parte recurrida) y su esposo, Manuel Arroyo Torres (en adelante señor Arroyo o parte recurrida)[1] sobre la compraventa de una propiedad inmueble en proceso de construcción.

---

[1] Véase, págs. 0014-0015, del Apéndice del recurso de la parte recurrente. *Moción para incluir al esposo de la querellante en la querella* presentada por Kiara Valdés Irizarry el 11 de septiembre de 2024. Véase, también, págs. 0022-0025, del

Por los fundamentos que expondremos a continuación, se *confirma* la *Resolución* recurrida.

**I**

Conforme se desprende del expediente administrativo ante nuestra consideración, el 10 de junio de 2024, la señora Valdés presentó una *Querella* ante el DACo en contra de la compañía de bienes raíces, CEN Realty Corp., su representante y corredora, Cecilia Fernández, y de NSB Vega Baja LLC[2]. Según reza la *Querella*, este caso se remonta al mes de junio de 2022, fecha en la que la señora Valdés y su esposo el señor Arroyo Torres, estaban interesados en comprar una vivienda en construcción en el proyecto La Sabana, sito en el municipio de Vega Baja. En síntesis, reclamaron a la parte recurrida por el atraso en la entrega de la propiedad y el cambio en el precio pactado mediante el Contrato Uniforme de Compraventa el 8 de junio de 2022. Lo anterior, debido a que, con posterioridad a la firma del contrato, CEN Realty Corp. le comunicó a la señora Valdés que el precio contratado para la compraventa aumentaría en aproximadamente treinta mil dólares ($30,000.00) debido al alza en materiales del mercado de la construcción[3]. La parte recurrida expresó lo siguiente:

---

Apéndice del recurso de la parte recurrente. *Notificación de Vista Administrativa* del 13 de enero de 2025 para vista el 10 de febrero de 2025 en donde aparecen Kiara Valdés Y/O Manuel Arroyo Torres como parte querellante en el epígrafe.

[2] Véase, págs. 0001-0006, del Apéndice del recurso de la parte recurrente. Notificación de *Querella* ARE 2024-0006359.

[3] Véase, págs. 0028-0029 y 0038, del Apéndice del recurso de la parte recurrente. Cartas de los suplidores PROMIX Concretos |Professional Ready Mix, Inc., Avanti Kitchens Inc., Air Master Group.   Véase, también, págs. 0030-0035, del Apéndice del recurso de la parte recurrente. Incluye un Permiso de Construcción enmendado de la Oficina de Gerencia y Permisos con fecha de expedición del 31/05/2024 que describe el proyecto como sigue:

[…]

Asunto: Segunda enmienda a Permiso de Construcción 2020-302705-PCOC-005502, aprobado el 31 de enero de 2021 que consiste en división del proyecto para efectos de financiamiento en Fase IA y Fase IB, se incluye una hoja nueva C101B con la subdivisión propuesta para efectos de financiamiento; las obras previamente aprobadas no son afectadas por la división en fases para financiamiento y aumento en estimado por ajuste de costos de mercado por $296,900.00.

[…]

"[…]Por favor Daco, ayúdenme[.] Tengo una beba estuve ahorrando todo este tiempo para poder comprar la casa que estaba en $230,000 y no en [$]260,0000 [*sic*]. El contrato est[á] firmado y entregado. Llevo tiempo esperando esta propiedad para que ahora me digan esto.[…]"

La parte recurrida afirmó que, a pesar de que suplicó que se le mantuviera el precio anunciado y firmado en el contrato original, el desarrollador no accedió a su reclamo.

Luego de varios trámites procesales, el 10 de febrero de 2025, se celebró la vista administrativa para dilucidar la querella de los recurridos.

Celebrada la vista administrativa, el DACo, mediante *Resolución* emitida el 22 de abril de 2025 y notificada el 24 de abril de 2025, declaró *Con Lugar* la *Querella* incoada por la señora Valdés y el señor Arroyo Torres, por lo que ordenó la celebración de la venta a los recurridos de la unidad 1049 del proyecto La Sabana al precio establecido de $229,000.00 e impuso honorarios de abogado por la suma de ochocientos dólares ($800.00) a beneficio de los recurridos. y el otorgamiento de la correspondiente escritura pública. Por otro lado, desestimó la *Querella* en contra Cen Realty Corp.

En su dictamen, la agencia consignó las siguientes determinaciones de hechos[4]:

### DETERMINACIONES DE HECHOS

1. Allá en o para el mes de junio de 2022 los esposos querellantes Kiara Valdés y Manuel Arroyo se interesaron en la compra de una propiedad inmueble en un proyecto de vivienda en construcción en el municipio de Vega Baja, conocido como urbanización La Sabana.

2. El querellado NSB Vega Baja LLC (en adelante NSB Vega Baja) es el desarrollador del proyecto La Sabana y vendedor de las unidades de vivienda.

3. Los querellantes estuvieron en comunicación con personal de Cen Realty Corp. (en adelante Cen Realty), entidad corredora de bienes raíces a cargo

---

[4] Véase, págs. 0054-0073, del Apéndice del recurso de la parte recurrente. *Resolución.* También, véase, 0039-0053, *CONTRATO UNIFORME DE COMPRAVENTA* para el lote 1049 que anuncia el precio de $229,000.00.

de realizar las gestiones o proceso para la venta de las unidades del proyecto y/o representante del desarrollador NSB Vega Baja.

4. Los querellantes decidieron que adquirirían la unidad identificada como lote número 1185, con un precio de $231,100.00. La compra se efectuaría mediante un préstamo hipotecario que los querellantes estarían tramitando con una institución bancaria.

5. El 8 de junio de 2022 los querellantes firmaron con NSB Vega Baja como vendedor un "CONTRATO UNIFORME DE COMPRAVENTA" referente a la unidad identificada como número 1185. A dicha fecha esta propiedad no estaba construida.

6. Los querellantes pagaron como depósito la suma de $1,000.00.

7. El "CONTRATO UNIFORME DE COMPRAVENTA", referente a la unidad número 1185, dispone lo siguiente, en particular:

"Mediante este contrato, celebrado en sitio y fecha que al final se indican entre la VENDEDORA NSB Vega Baja, LLC urbanizador y/o constructor...y el COMPRADOR, cuyo nombre y circunstancias personales se indican en la cláusula 29 que sigue, la VENDEDORA se obliga a vender al COMPRADOR y éste se obliga a comprar a la VENDEDORA el inmueble más adelante descrito, todo ello sujeto a las siguientes:

CL[Á]USULAS Y CONDICIONES

...
4. El precio de compraventa es de $231,100.00, el cual no podrá ser variado, excepto por acuerdo entre el COMPRADOR y la VENDEDORA. A esta fecha, el precio de compraventa se desglosa como sigue:

...
Pagados en este acto...............................$1,000

...
14. En los casos en que se financie el balance del precio de compraventa, el COMPRADOR se obliga a otorgar la escritura de hipoteca concurrentemente con el otorgamiento de la correspondiente Escritura de Compraventa y se obliga a comparecer al lugar, sitio y hora designados, ante el notario designado por la VENDEDORA a otorgar la mencionada escritura de hipoteca y pagar los gastos legales de dicho otorgamiento. De todo lo anterior deberá ser notificado por la VENDEDORA con no menos de treinta (30) días de anticipación a la fecha del otorgamiento por correo certificado con acuse de recibo.

15. El COMPRADOR se compromete a comparecer en la fecha, sitio y hora designados por la VENDEDORA y otorgar ante el notario público designado por la VENDEDORA la escritura final de compraventa e hipoteca y el correspondiente pagaré a la orden del acreedor hipotecario. En ese mismo acto, la VENDEDORA entregará al COMPRADOR la llave y el permiso de uso de la vivienda. Antes de citar al COMPRADOR para firmar las escrituras finales, la VENDEDORA se compromete a certificar que la vivienda objeto del contrato está terminada conforme a los planos. La fecha designada será dentro de los dieciocho (18) meses desde la fecha en que se firmó este contrato, previa antelación a tal efecto por correo certificado con acuse de recibo con treinta (30) días de antelación.

...

22. Mediante debida notificación al COMPRADOR, la VENDEDORA podrá resolver este contrato en cualquiera de los siguientes casos:

   a) Cuando el COMPRADOR no paga el pronto pago exigido por este contrato en el término establecido en la cláusula 4 de este contrato a tal efecto ("A pagarse en _____").

   b) Cuando el COMPRADOR, sin causa justificada, se niega a firmar o no concurre a la firma de la Escritura de Compraventa después de habérsele requerido para ello por la VENDEDORA por escrito en la forma y términos que en este contrato se señalen, o si tardare más de diez (10) días laborables en atender cualquier otro requerimiento que le hiciera la VENDEDORA por correo certificado con acuse de recibo en relación con la tramitación del préstamo hipotecario o de la compraventa, O si a la fecha de la compraventa constara por escrito que el préstamo hipotecario fue denegado por razón de falta de diligencia del solicitante, a tenor con la obligación asumida en la cláusula cinco (5) de este contrato.

   c) Cuando el COMPRADOR notifica por escrito a la VENDEDORA que no tiene interés en seguir con los trámites de compra de la unidad de vivienda.

   d) When the PURCHASER notifies the SELLER that he is no longer interested in proceeding with the purchase of the dwelling.

e) Si por fuerza mayor o caso fortuito no fuese posible cumplir con los términos el contrato.

En los casos de resolución de este contrato por las causas en que se requieren los incisos (a), (b) y (c) de esta cláusula o en cualquier otro caso de resolución en que medie incumplimiento del COMPRADOR y no haya causa imputable a la VENDEDORA, ésta podrá retener, sin probar daños, la cantidad máxima de dos porciento (2%) del precio de compraventa como pago total por los gastos incurridos.

23. En caso de que el COMPRADOR o la VENDEDORA decida resolver este contrato de acuerdo a las causas aquí estipuladas, deberá notificar su decisión por correo certificado con acuse de recibo a la VENDEDORA o al COMPRADOR, según sea el caso, y expondrá la causa de dicha resolución. Si una parte notifica personalmente, la otra parte firmará un recibo de dicha notificación. Si la parte notificada está de acuerdo con la resolución propuesta, la VENDEDORA procederá a devolver el depósito del COMPRADOR, y sus intereses, de haberlos, y/o podrá retener la suma autorizada en este contrato de acuerdo con y en estricto cumplimiento al procedimiento establecido para cuentas de depósito (escrow) en el Reglamento dentro de los treinta (30) días siguientes de haber recibido dicha notificación.

...

25. Las notificaciones relacionadas con este contrato que no se hayan previsto en algunas cláusulas de este contrato por parte de la VENDEDORA al COMPRADOR y del COMPRADOR a la VENDEDORA, se harán con no menos de quince (15) días de anticipación y por correo certificado con acuse de recibo, o por tele-copiadora con cinco (5) días de anticipación a la dirección de cualquiera de las partes según tal dirección se consigna al final de este documento. Cualquier notificación que se haga personalmente a una parte, la otra deberá firmar un recibo de notificación a la parte que notifica.

...

27. Este contrato contiene todo lo estipulado por las partes, y sólo se podrá modificar por escrito previa aprobación de DACO y obliga a las partes, a sus sucesores y a sus causahabientes, y no podrá ser cedido ni traspasado por el COMPRADOR.

...

8. Los querellantes estaban entusiasmados y muy ilusionados con la adquisición de la propiedad en La Sabana. Éstos vivían en Las Piedras y trabajan en Dorado, por lo que se mudaron de pueblo y alquilaron una vivienda pero mantenían el pensamiento de que ya tenían la casa que deseaban opcionada. Tenían el anhelo y deseo de comprar su vivienda en dicho proyecto ya que les quedaría más cerca para viajar a sus trabajos. También tenían la esperanza de que al tener su propio hogar tendrían la estabilidad familiar que aún no tenían con su hija de 3 años.

   Los querellantes estaban pendientes al progreso de la obra, se comunicaban periódicamente con el querellado para conocer el estatus de la construcción del proyecto y/o viviendas. Originalmente el representante de NSB Vega Baja les indicó que la entrega de la casa sería en un año. Luego se les indicó mediante llamada telefónica que el proyecto estaba atrasado y que tardaría más tiempo.

9. Posteriormente, los querellantes recibieron una llamada telefónica de la *realtor* que representaba a NSB Vega Baja en el proceso de venta. Esta les informó que se desconocía fecha de construcción de la casa que seleccionaron ya que no se sabía si se continuaría el proyecto para la fase donde ubicaba la misma, y se les dio la opción de cambiar el lote escogido por una de las primeras casas del proyecto que estarían listas más rápido en unos seis meses.

10. Los querellantes aceptaron cambiar la unidad seleccionada por una de las viviendas que se les indicó que estarían para entrega más rápida. Esos seleccionaron la unidad identificada como lote número 1049, con un precio de $229,000.00 ya que era un lote que consistía de menos metros de terreno que el previamente escogido. Los querellantes aceptaron dicho cambio para así poder adquirir más rápido una propiedad en La Sabana, toda vez que tenían un gran deseo de ya comprar su casa allí y comenzar a vivir en ella. Por lo que firmaron otro "CONTRATO UNIFORME DE COMPRAVENTA", referente a la unidad identificada como número 1049 con la misma fecha del 8 de junio de 2022.

11. El "CONTRATO UNIFORME DE COMPRAVENTA" referente a la unidad número 1049 es idéntico en sus cláusulas y condiciones al primer "CONTRATO UNIFORME DE COMPRAVENTA" referente a la unidad número 1185, con excepción de la descripción de la medida del área aproximada del inmueble dispuesta en la cláusula 1.

12. El "CONTRATO UNIFORME DE COMPRAVENTA", referente a la unidad número 1049, dispone lo siguiente, en particular:

"Mediante este contrato, celebrado en sitio y fecha que a final se indican entre la VENDEDORA <u>NSB Vega Baja, LLC</u>, urbanizador y/o constructor ... y el COMPRADOR, cuyo nombre y circunstancias personales se indican en la cláusula 29 que sigue, la VENDEDORA se obliga a vender al COMPRADOR y este se obliga a comprar a la VENDEDORA el inmueble más adelante descrito, todo ello sujeto a las siguientes:

CL[Á]USULAS Y CONDICIONES

...

4. El precio de compraventa es de <u>$229,100.00</u>, el cual no podrá ser variado, excepto por acuerdo entre el COMPRADOR y la VENDEDORA. A esta fecha, el precio de compraventa se desglosa como sigue:

...
Pagados en este acto................................$1,000

...

14. En los casos en que se financie el balance del precio de compraventa, el COMPRADOR se obliga a otorgar la escritura de hipoteca concurrentemente con el otorgamiento de la correspondiente Escritura de Compraventa y se obliga a comparecer al lugar, sitio, hora designados, ante el notario designado por la VENDEDORA a otorgar la mencionada escritura de hipoteca y pagar los gastos legales del otorgamiento. De todo lo anterior deberá ser notificado por la VENDEDORA con no menos de treinta (30) días de anticipación a la fecha del otorgamiento, por correo certificado con acuse de recibo.

15. El COMPRADOR se compromete a comparecer en la fecha, sitio y hora designados por la VENDEDORA y otorgar ante el notario público designado por la VENDEDORA la escritura final de compraventa e hipoteca y el correspondiente pagaré a la orden del acreedor hipotecario. En ese mismo acto la VENDEDORA entregará al COMPRADOR la llave y el permiso de uso de la vivienda. Antes de citar al COMPRADOR para firmar las escrituras finales, la VENDEDORA se compromete a certificar que la vivienda objeto del contrato está terminada conforme a los planos. La fecha designada será dentro de los dieciocho (18) meses desde la fecha en que se firmó este contrato, previa antelación a tal efecto por correo certificado con acuse de recibo con treinta (30) días de antelación.

...

22. Mediante debida notificación al COMPRADOR, la VENDEDORA podrá resolver este contrato en cualquiera de los siguientes casos:

a) Cuando el COMPRADOR no paga el pronto pago exigido por este contrato en el término establecido en la cláusula 4 de este contrato a tal efecto ("A pagarse en _____").

b) Cuando el COMPRADOR, sin causa justificada, se niega a firmar o no concurre a la firma de la Escritura de Compraventa después de habérsele requerido para ello por la VENDEDORA por escrito en la forma y términos que en este contrato se señalen, o si tardare más de diez (10) días laborables en atender cualquier otro requerimiento que le hiciera la VENDEDORA por correo certificado con acuse de recibo en relación con la tramitación del préstamo hipotecario o de la compraventa, O si a la fecha de la compraventa constara por escrito que el préstamo hipotecario fue denegado por razón de falta de diligencia del solicitante, a tenor con la obligación asumida en la cláusula cinco (5) de este contrato.

c) Cuando el COMPRADOR, notifica por escrito a la VENDEDORA que no tiene interés en seguir con los trámites de compra de la unidad de vivienda.

d) When the PURCHASER notifies the SELLER that he is no longer interested in proceeding with the purchase of the dwelling.

e) Si por fuerza mayor o caso fortuito no fuese posible cumplir con los términos del contrato.

En los casos de resolución de este contrato por las causas en que se requieren los incisos (a), (b) y (c) de esta cláusula o en cualquier otro caso de resolución en que medie incumplimiento del COMPRADOR y no haya causa imputable a la VENDEDORA, ésta podrá retener, sin probar daños, la cantidad máxima de dos porciento (2%) del precio de compraventa como pago total por los gastos incurridos.

23. En caso de que el COMPRADOR o la VENDEDORA decida resolver este contrato de acuerdo a las causas aquí estipuladas, deberá notificar su decisión por correo certificado con acuse de recibo a la VENDEDORA o al COMPRADOR, según sea el caso, y expondrá la causa de dicha resolución. Si una parte notifica personalmente, la otra parte firmará

un recibo de dicha notificación. Si la parte notificada está de acuerdo con la resolución propuesta, la VENDEDORA procederá a devolver el depósito del COMPRADOR, y sus intereses de haberlos, y/o podrá retener la suma autorizada en este contrato de acuerdo con y en estricto cumplimiento al procedimiento establecido para cuentas de depósito (escrow) en el Reglamento dentro de los treinta (30) días siguientes de haber recibido dicha notificación.

...

25. Las notificaciones relacionadas con este contrato que no se hayan previsto en algunas cláusulas de este contrato por parte de la VENDEDORA al COMPRADOR y del COMPRADOR a la VENDEDORA, se harán con no menos de quince (15) días de anticipación a la dirección de cualquiera de las partes según tal dirección se consigna al final de este documento. Cualquier notificación que se haga personalmente a una parte, la otra deberá firmar un recibo de notificación a la parte que notifica.

...

27. Este contrato contiene todo lo estipulado por las partes, y sólo se podrá modificar por escrito previa aprobación de DACO y obliga a las partes, a sus sucesores y a sus causahabientes, y no podrá ser cedido ni traspasado por el COMPRADOR.

...

13. Los querellantes decidieron no continuar pagando un alquiler por vivienda y se mudaron a vivir con unos familiares toda vez que el representante de NSB Vega Baja les había informado que la entrega de la casa sería en unos seis meses y pensaron que era poco tiempo de espera.

14. Los querellantes continuaban comunicándose periódicamente con el querellado para conocer el estatus de la construcción de la propiedad.

15. Posteriormente, el representante de NSB Vega Baja le comunicó a los querellantes, mediante llamada telefónica, que el precio de la propiedad aumentaría unos $40,000.00. Los querellantes no estuvieron de acuerdo, alegaron que el precio del contrato no podía ser variado y le reclamaron el cumplimiento del contrato firmado, pero sus gestiones resultaron infructuosas.

16. Los querellantes se sintieron tristes, decepcionados y desilusionados ya que habían hecho muchos sacrificios para ahorrar dinero para los gastos de cierre que corresponderían al precio pactado. También tuvieron que volver a buscar vivienda alquilada.

17. El 10 de junio de 2024 los querellantes radicaron en el DACO la querella de epígrafe. Éstos alegaron, en síntesis, que originalmente la propiedad les sería entregada en el plazo de 1 año; que luego cambiaron la fecha de entrega y han ido atrasándola que luego de dos años de espera, en mayo, les informaron que el precio con el cual firmaron fue aumentado porque los costos han subido; que les indicaron que debían decidir si pagarían la diferencia o renunciaban a la casa. Los querellantes solicitaron como remedio que el precio de venta continuara siendo el establecido en el contrato firmado.

18. Los querellantes nunca han desistido del contrato y siempre le han manifestado a NSB Vega Baja su continuo interés en la adquisición de la propiedad al precio contratado, que le cumplan con el contrato y se le honre el precio de venta acordado.

19. El querellado ha presentado una actitud temeraria en la situación en controversia.

El 14 de mayo de 2025, NSB Vega Baja LLC, presentó su *Moción de Reconsideración*[5]. Subrayó la necesidad de variación de las cláusulas contractuales contenidas en el contrato modelo que el DACo requiere a todo desarrollador. Se apoyó en las cartas de los suplidores que informaban sobre los aumentos en costos en la industria de la construcción. Invocó la figura *rebus sic stantibus* para justificar la revisión del contrato. Insistió en que las causas sobre el aumento en los costos de construcción no son atribuibles a la corporación. Por último, expresó que DACo incurrió en parcialidad y error manifiesto, por lo que su decisión debía ser revisada. Transcurridos los quince (15) días, sin que el ente administrativo actuara sobre la aludida moción de reconsideración, la parte recurrida compareció oportunamente ante este foro revisor.

Insatisfecha, el 26 de junio de 2025, la parte recurrente instó este *Recurso de Revisión Judicial* y esbozó los siguientes errores:

Primer Error

Erró el DACo al ignorar y omitir atender la prueba y los argumentos de derecho presentados por la parte recurrente, violando su debido proceso de ley,

---

[5] Véase, págs. 0074-0080, del Apéndice del recurso de la parte recurrente.

coartando su derecho a una revisión judicial efectiva, actuando de manera parcializada y al margen de las constancias del expediente administrativo.

Segundo Error

Erró el DACo al imponer el pago de honorarios de abogado por temeridad sin justificación de clase alguna y a pesar de que la parte recurrente presentó una posición fundamentada en hecho y derecho.

El 3 de julio de 2025, este Tribunal concedió a la parte recurrida, mediante *Resolución,* hasta el 29 de julio de 2025 para presentar su oposición. También, ordenó a la agencia presentar copia certificada del expediente administrativo.

A pesar de haber transcurrido el término concedido, las partes recurridas no han comparecido ante este foro revisor, por lo cual, damos por perfeccionado el recurso y procedemos a resolver el mismo sin el beneficio de su comparecencia.

## II

### A. *Estándar de Revisión Judicial de Determinaciones Administrativas*

De ordinario los tribunales apelativos debemos otorgar deferencia y respeto a las conclusiones e interpretaciones hechas por las agencias administrativas[6]. *Vázquez v. Consejo de Titulares,* 2025 TSPR 56, 215 DPR ___ (2025); *OEG v. Martínez Giraud,* 210 DPR 79, 88-89 (2022); *Pérez López v. Depto. Corrección,* 208 DPR 656, 672 (2022); *Super Asphalt v. AFI y otros,* 206 DPR 803, 819 (2021); *Graciani Rodríguez v. Garaje Isla Verde,* 202 DPR 117, 126 (2019). No obstante, tal norma no es absoluta, es por lo que, nuestro Máximo Foro ha enfatizado que no podemos imprimirle un sello de corrección, so pretexto de deferencia a las determinaciones administrativas que sean irrazonables, ilegales o contrarias a derecho. De igual manera, la más Alta Curia ha expresado que, la consideración otorgada por los tribunales no equivale a una

---

[6] *Rolón Martínez v. Supte. Policía,* 201 DPR 26,35 (2018); *Torres Rivera v. Policía de PR,* 196 DPR 606, 626 (2016).

renuncia de nuestra función revisora. *Vázquez v. Consejo de Titulares*, supra.

En *Torres Rivera v. Policía de Puerto Rico*, 196 DPR 606, 628 (2016), nuestro Tribunal Supremo resumió las normas básicas en torno al alcance de la revisión judicial de la forma siguiente:

> [L]os tribunales deben deferencia a las decisiones de una agencia administrativa, pero tal deferencia cederá cuando: (1) la determinación administrativa no está basada en evidencia sustancial; (2) el ente administrativo erró en la aplicación o interpretación de las leyes o reglamentos que se le ha encomendado administrar; (3) el organismo administrativo actuó arbitraria, irrazonable o ilegalmente, realizando determinaciones carentes de una base racional, o (4) la actuación administrativa lesionó derechos constitucionales fundamentales[7].

El criterio rector bajo el cual los tribunales deben revisar las decisiones administrativas es el criterio de razonabilidad. *OEG v. Martínez Giraud*, supra, pág. 89; *Super Asphalt v. AFI y otros*, supra, pág. 820; *Graciani Rodríguez v. Garaje Isla Verde*, supra, pág. 127; *Torres Rivera v. Policía de PR*, supra, pág. 626. Bajo este criterio, se debe dirimir si la agencia actuó de forma arbitraria o ilegal, o de manera tan irrazonable que su actuación constituya un abuso de discreción. *Íd.*; *Pérez López v. Depto. Corrección*, supra, pág. 673; *OEG v. Martínez Giraud*, supra; *Super Asphalt v. AFI y otros*, supra, págs. 819-820[8].

Bajo este supuesto, la Sec. 4.5 de la Ley Núm. 38 del 30 de junio de 2017, 3 LPRA 9675, conocida como la Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico (LPAU), "estableció el marco de revisión judicial de las agencias administrativas". *Rolón Martínez v. Supte. Policía*, 201 DPR 26, 35 (2018). La intervención del tribunal se limita a tres áreas, a saber: (1) si el remedio concedido por la agencia fue apropiado; (2) si las

---

[7] Véase *Super Asphalt v. AFI y otros*, supra, págs. 819-820.
[8] *Graciani Rodríguez v. Garaje Isla Verde*, supra, pág. 127; *Rolón Martínez v. Supte. Policía*, supra, pág. 36; *Batista, Nobbe v. Jta. Directores*, supra, pág. 216.

determinaciones de hecho que realizó la agencia están sostenidas por evidencia sustancial que obra en el expediente administrativo visto en su totalidad, y (3) si las conclusiones de derecho del ente administrativo fueron correctas. *Íd.* págs. 35-36; *OEG v. Martínez Giraud*, supra, pág. 90*; Torres Rivera v. Policía de PR*, supra, págs. 626-627; *Batista, Nobbe v. Jta. Directores*, 185 DPR 206, 217 (2012); Sec. 4.5 de la LPAU, 3 LPRA sec. 9675.

Las determinaciones de hechos contenidas en las decisiones de las agencias, *podrán* ser sostenidas por el tribunal cuando estén basadas en evidencia sustancial que obra en el expediente administrativo. Mientras que, conclusiones de derecho serán revisables en todos sus aspectos por el tribunal. Sección 4.5 de la Ley Núm. 38-2017, 3 LPRA sec. 9675; *Vázquez v. Consejo de Titulares*, supra; *OEG v. Martínez Giraud,* supra, pág. 90; *Super Asphalt v. AFI y otros,* supra, págs. 819-820.

Los foros revisores podrán apoyarse en las interpretaciones de las agencias. Sin embargo, dichas interpretaciones "constituyen un acervo de experiencias y criterios informados a los cuales los tribunales y los litigantes bien podrán recurrir a modo de guía" y no avalar irreflexivamente, como se hacía en el pasado. *Vázquez v. Consejo de Titulares*, supra. En casos administrativos el tribunal deberá realizar su tarea con un "*body of experience and informed judgment*" de la agencia, entre otra información a su disposición. *Íd.* De igual manera, los tribunales deberán ejercer un juicio independiente al decidir si una agencia ha actuado dentro del marco de sus facultades estatutarias. *Íd.*

### B. Los Contratos en General

Según es sabido, las obligaciones nacen de la ley, los contratos, los cuasicontratos, los actos ilícitos, de los actos u omisiones en las que interviene culpa o negligencia, y de cualquier otro acto idóneo para producirlas, conforme el ordenamiento

jurídico. Art. 1063 del Código Civil de Puerto Rico de 2020, 31 LPRA sec. 8984; *Universal Ins. v. Popular Auto*, 207 DPR 228, 238 (2021); *NHIC et al. v. García Passalacqua et al.*, 206 DPR 105, 118 (2021). Nuestro Código Civil define el contrato como aquel "negocio jurídico bilateral por el cual dos o más partes expresan su consentimiento en la forma provista por ley, para crear, regular modificar o extinguir obligaciones". Art. 1230 del Código Civil de Puerto Rico, 31 LPRA sec. 9751; *Amador v. Conc. Igl. Univ. de Jesucristo*, 150 DPR 571, 581 (2000). El contrato se perfecciona desde que las partes manifiestan su consentimiento sobre el objeto y la causa, es decir, cuando median el objeto, consentimiento y causa. Art. 1237 del Código Civil de Puerto Rico, 31 LPRA sec. 9771; *Pérez Rodríguez v. López Rodríguez et at.*, 210 DPR 163, 186 (2022). No obstante, lo anterior no aplica en los casos en que sea requerido el cumplimiento de una formalidad solemne o cuando se pacta una condición suspensiva. Art. 1237 del Código Civil de Puerto Rico, 31 LPRA sec. 9771. En nuestro ordenamiento jurídico se ha reconocido el principio de libertad de contratación, éste faculta a las partes a contratar o no hacerlo con determinada persona, así como pactar los términos y condiciones que tengan por conveniente. Art. 1232 del Código Civil de Puerto Rico, 31 LPRA sec. 9753; *Pérez Rodríguez v. López Rodríguez et at.*, supra, pág. 187; *Burgos López et al. v. Condado Plaza*, 193 DPR 1, 7-8 (2015); *Arthur Young & Co. v. Vega III*, 136 DPR 157, 169-170 (1994). Sin embargo, tal libertad no es infinita, puesto que, las partes podrán acordar cualquier cláusula que no sea contraria a la ley, a la moral o al orden público. Art. 1232 del Código Civil de Puerto Rico, 31 LPRA sec. 9753; *Burgos López et al. v. Condado Plaza*, supra, págs. 7-8; *Oriental Bank v. Perapi et al.*, 192 DPR 7, 15 (2014). Una vez se perfecciona el contrato, lo acordado en este tiene fuerza de ley entre las partes, ante sus sucesores y ante terceros en la forma que dispone la ley.

Art. 1233 del Código Civil de Puerto Rico, 31 LPRA sec. 9754.

Finalmente, los tribunales estamos facultados para velar por el cumplimiento de los contratos, y no debemos relevar a una parte del cumplimiento de su obligación contractual cuando tal contrato sea legal, válido y no contenga vicio alguno. *Mercado, Quilichini v. UCPR*, 143 DPR 610, 627 (1997).

### C. *El Contrato de Opción de Compra*

Nuestro Código Civil de 2020, en su Artículo 1029[9], define el contrato de opción de compra de la siguiente manera:

> La opción de compra es el derecho que faculta a su titular para que decida durante un plazo determinado, mediante la manifestación de su aceptación, el perfeccionamiento del contrato de compraventa que ha sido ya acordado en todos sus aspectos fundamentales y secundarios y a cuyo cumplimiento se mantiene comprometido el concedente durante el plazo prefijado.

El contrato o pacto de opción de compraventa se trata de un contrato que ha sido definido por la jurisprudencia como, "[...] un contrato consensual, mediante el cual una parte (promitente) le concede a otra (optante) el derecho exclusivo a decidir de manera unilateral si comprará determinado bien inmueble que le pertenece al promitente. Esta facultad tendrá que ejercitarse dentro de un periodo de tiempo definido por las partes, y tanto el promitente como el optante se beneficiarán del negocio". *SLG Irizarry v. SLG García*, 155 DPR 713, 722 (2001). Esencialmente, el contrato de opción de compra es un contrato preparatorio dirigido al eventual otorgamiento de un contrato de compra y venta. El mismo se distingue por los siguientes elementos esenciales: (1) se concede al optante la facultad de decidir unilateralmente si celebrará el contrato principal (de compraventa) sin obligación por parte de éste; (2) dicha concesión tiene carácter de exclusividad; (3) se establece un plazo para ejercitar la opción, y (4) no existe otra condición que

---

[9] 31 LPRA sec. 8821.

no sea la voluntad del optante[10]. No obstante, a pesar de que el contrato de opción se trata de un contrato consensual, la opción de compra es un contrato unilateral, debido a que el optante no está obligado a comprar, contrario al caso del promitente que sí está obligado a venderle al primero, si aquel lo decide[11].

Ahora bien, sobre la posibilidad de obligarle a transferir su propiedad a otro particular sólo puede hablarse cuando ha habido acuerdo sobre la cosa y el precio. Por otro lado, cuando lo único que se ha acordado es la venta, sin más, ni siquiera el juicio imparcial de un juez respecto al valor en el mercado del bien en controversia puede sustituir la prerrogativa dominical de fijar el precio y establecer los términos de la enajenación, prerrogativa que, en este sistema, solo le compete al dueño[12]. Cabe señalar que:

> En la opción se da un proceso negocial en donde el consentimiento hacia la obligación surge, como en todo contrato, en virtud del intercambio de manifestaciones recepticias. La voluntad se forja a base de un proceso de negociación. No se trata de manifestación unilateral de voluntad, porque las obligaciones que surgen del pacto de opción son el resultado de un proceso de negociación entre el concedente y el optante, proceso que no se da en las obligaciones cuya fuente es la mencionada manifestación unilateral de voluntad[13].

El contrato de opción de compra tiene que definir la oferta que habrá de mantenerse vigente con todos los elementos de una oferta final y completa del contrato de compraventa. Dicho de otro modo, para que estemos ante un verdadero pacto de opción, no pueden quedar por negociar términos o condiciones del contrato de compraventa que sean de importancia para las partes[14]. Dentro de este marco, "[r]especto al precio de la finca, que es el que importa desde el punto del contenido de la oferta, tiene que tratarse de un precio en metálico, porque se trata de una oferta de venta, no de

---

[10] *Íd.* a la pág. 722.
[11] *Íd.*
[12] Michel J. Godreau, *La opción de compra en Puerto Rico,* 53 Rev. Jur. UPR 569 (1984) a la pág. 569.
[13] *Íd.* a la pág. 578.
[14] *Íd.* a la pág. 596.

permuta. Además, aplican aquí los principios de las obligaciones respecto a los requisitos de la prestación, en particular, el de la determinabilidad de la misma. No será necesario que el precio de venta esté exactamente determinado, siempre y cuando su determinación final no requiera un nuevo proceso de negociación[15].

Habidas cuentas, este tipo de contrato preparatorio produce una obligación de hacer y no de dar, ya que sólo tiene por objeto la realización futura de un contrato de compraventa. *Soto v. Rivera*, 144 DPR 500, 509-510 (1997); *Dennis, Metro Invs. v. City Fed. Savs.,* 121 DPR 197, 221-222 (1988); *Jordán-Rojas v. Padró-González*, 103 DPR 813, 817 (1975). El contrato de promesa bilateral tiene la ventaja de lograr la vinculación inmediata de las partes cuando por alguna razón no puede otorgarse una compraventa completa y definitiva y que, mediante la vinculación inmediata, las partes logran la garantía o seguridad de que el contrato definitivo o completo se celebrará o concluirá más tarde. *Rossy v. Tribunal Superior*, 80 DPR 729, 742 (1958).

Por consiguiente, ante la negativa de una de las partes de cumplir con la promesa bilateral, cabe una acción para exigir su cumplimiento específico y no simplemente una acción para el resarcimiento de perjuicios, si la prestación básica no se refiere a hechos personalísimos o las líneas básicas sentadas en el precontrato no son insuficientes[16]. Así pues, si la cosa prometida en venta está todavía en el patrimonio del promitente, el acreedor en un contrato de promesa bilateral de venta de un inmueble podría exigir su cumplimiento en forma específica: la celebración de la venta previamente convenida y el otorgamiento de la correspondiente escritura pública[17].

---

[15] *Íd.* a la pág. 597.
[16] *Íd.* a la pág. 743. Véase también, *Jordán-Rojas v. Padró-González*, 103 DPR a la pág. 819.
[17] *Íd.*

### D. Facultades del Departamento de Asuntos del Consumidor

El Departamento de Asuntos del Consumidor fue creado mediante la Ley Núm. 5 de 23 de abril de 1973, según enmendada, conocida como la *Ley Orgánica del Departamento de asuntos del Consumidor*, 3 LPRA sec. 341. Este fue creado con el propósito primordial de vindicar e implementar los derechos del consumidor. Art. 3 de la Ley Núm. 5 de 23 de abril de 1973, *supra*, 3 LPRA sec. 341b; *Martínez v. DACo*, 163 DPR 594, 600 (2004); *DACo v. Fcia. San Martin*, 175 DPR 198, 204 (2009). Esta ley, le impone al Secretario de DACo, "el deber ministerial de promover y velar por el cumplimiento *de todas* las leyes, las reglas, los reglamentos y las órdenes que afecten los intereses del consumidor. *Íd.* págs. 204-205. (Citas omitidas).

En sintonía con lo anterior, la referida ley le concede al Secretario del DACo varios poderes y facultades, entre estos se encuentra el atender, investigar y resolver las queja y querellas que los consumidores presenten y servicios adquiridos o recibidos por parte del sector privado de la economía. Art. 6(c) de la Ley Núm. 5 de 23 de abril de 1973, *supra*, 3 LPRA sec. 3418(e). Además, cuenta con la facultad de "poner en vigor, implementar y vindicar los derechos de los consumidores, tal como están contenidos en todas las leyes vigentes, a través de una estructura de adjudicación administrativa con plenos poderes para adjudicar las querellas que se traigan ante su consideración y conceder los remedios pertinentes conforme a Derecho". Art. 6(d) de la Ley Núm. 5 de 23 de abril de 1973, *supra*, 3 LPRA sec. 3418(e).

Conforme a los poderes delegados, el DACo aprobó el Reglamento de Procedimientos Adjudicativos del DACo, Reglamento 8034 del 14 de junio de 2021. Lo anterior, con el fin de asegurar la solución justa, rápida y económica de las querellas presentadas ante o por el DACo y así promover un procedimiento uniforme para su

adjudicación. Regla 1 del Reglamento 8034, *supra.* El referido reglamento aplica a las investigaciones y a los procedimientos administrativos sobre querellas iniciadas por los consumidores o por el DACo. Regla 3 del Reglamento 8034, *supra.* En lo pertinente, la Regla 4 del aludido reglamento define *consumidor* como "toda persona natural, que adquiere o utiliza productos o servicios como destinatario final. Incluye toda otra persona, asociación o entidad que por designación de ley está facultada para presentar su reclamación en el Departamento. Regla 4(f) del Reglamento 8034, *supra.*

### E. Honorarios de Abogados y las agencias administrativas

La Sección 3.21 (e) de la Ley Núm. 38 del 30 de junio de 2017, 3 LPRA 9661 (e), conocida como la Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico (LPAU), Ley 38-2017, como parte de su función cuasijudicial, faculta a las agencias administrativas a imponer costas y honorarios de abogados, en los mismos casos que dispone la Regla 44 de Procedimiento Civil, según enmendada. Como sabemos, las Reglas de Procedimiento Civil no aplican automáticamente a los procedimientos administrativos. No obstante, en ocasiones anteriores nuestro más Alto Foro ha incorporado las mismas al ámbito administrativo, siempre y cuando estas sean compatibles con dicho proceso y propicien una solución justa, rápida y económica. *Moreno Lorenzo y otros v. Depto. Fam.*, 207 DPR 833, 841 (2021); *SLG Saldaña-Saldaña v. Junta*, 201 DPR 615, 623 (2018); *Flores Concepción v. Taíno Motors*, 168 DPR 504, 518-519 (2006).

En lo pertinente, la Regla 27.3 del Reglamento de Procedimientos Adjudicativos Núm. 8034, *supra,* dispone que: "[...] El funcionario, Secretario o Panel de Jueces que presida la vista podrá imponer a la parte perdidosa el pago de costas y honorarios de abogados. El procedimiento se regirá por lo dispuesto en la Regla

44 de la Ley de Procedimiento Civil de Puerto Rico de 2009, según enmendada.[...]".

La imposición de honorarios de abogados recae en la sana discreción del foro adjudicativo y se imponen en caso de temeridad y frivolidad.[18]  La temeridad es considerada como aquella actitud que afecta el buen funcionamiento y la administración de la justicia.[19]  Solamente, se intervendrá en caso de identificar un claro abuso de discreción de parte del foro adjudicativo.

Nuestro Alto Foro ha señalado que, una ley puede conceder capacidad a las agencias administrativas para imponer sanciones, penalidades o multas. No obstante, una vez concedida esa facultad dicho ejercicio debe regirse por criterios de razonabilidad. *Nadal v. Depto. Rec. Nat.,* 150 DPR 715, 721-723 (2000). Se reconoce que la agencia por su experiencia y especialización se encuentra en mejor posición de conocer los efectos de una violación a los intereses protegidos. De esta forma, se garantiza la uniformidad y coherencia en la imposición de las sanciones.

En ese sentido, la revisión judicial no tiene la consecuencia de que los tribunales puedan pasar juicio sobre la selección de las medidas adoptadas por la agencia administrativa en el descargo de sus funciones delegadas. De igual manera, esa valoración no debe ir encaminada a determinar si la sanción impuesta guarda proporción con la conducta sancionada. Ahora bien, la revisión judicial deberá limitarse a impedir que las agencias procedan de forma ilegal, arbitraria, en exceso de lo permitido por ley o en ausencia de evidencia sustancial que justifique la medida impuesta, de modo que se evidencie una actuación caprichosa o en abuso de

---

[18] *P.R. Oil v. Dayco,* 164 DPR 486, 511-512 (2005); *Blás v. Hosp. Guadalupe,* 146 DPR 267, 334 (1998) (citando a *Fernández v. San Juan Cement Co., Inc.,* 118 DPR 713, 717-719 (1987)).

[19] *P.R. Oil v. Dayco, supra,* págs. 510-511.  Véase, además, *S.L.G. Flores-Jiménez v. Colberg,* 173 DPR 843, 866 (2008); *Domínguez v. GA Life,* 157 DPR 690, 706 (2002); *Blás v. Hosp. Guadalupe, supra,* págs. 334-337. *Meléndez Vega v. El Vocero de PR,* 189 DPR 123, 212 (2013).

discreción por parte de la agencia. *Com. Seg. P.R. v. Antilles Ins. Co.*, 145 DPR 226, 233-234 (1998).

Esbozada la normativa jurídica que enmarca la controversia de epígrafe, procedemos a aplicarla.

**III**

En su primer señalamiento de error, la parte recurrente nos plantea que, erró la agencia recurrida al ignorar y omitir atender la prueba y los argumentos de derecho presentados ante en el proceso administrativo, lo que consideró una violación al debido proceso de ley a una revisión judicial efectiva.

Comenzamos por mencionar que la parte recurrente no evidenció haber realizado, conforme al derecho vigente, las notificaciones a la parte recurrida sobre el cambio en precio de la propiedad en controversia. Por lo tanto, no logró sostener que, en efecto, ocurrió una violación al debido proceso de ley en el proceso de revisión judicial. Nos explicamos.

La Asamblea Legislativa, mediante la *Ley de la Oficina del Oficial de Construcción* (Ley Núm. 130 de 13 de junio de 1967), Ley 130-1967, considera práctica indeseable del urbanizador y/o constructor[20] que no se comunique un **aviso mediante correo certificado** al optante o comprador con las enmiendas propuestas a los planos de una vivienda o modelos aprobados por la Junta de Planificación y/o la Administración de Reglamentos y Permisos[21] con por lo menos veinte (20) días de antelación a la radicación de la solicitud de enmiendas[22].

Sobre los contratos de opción, la Ley 130-1967 dispone que el comprador tendrá derecho a "exigir el cumplimiento específico de su

---

[20] Véase, *Ley de la Oficina del Oficial de Construcción adscrita al Departamento de Asuntos del Consumidor*, Art. 2(d), 17 LPRA sec. 502(d). La definición de "urbanizador o constructor" no fue debatida por las partes.
[21] Oficina de Gerencia de Permisos creada por la Ley 161-2006, 23 LPRA sec. 9013 *et seq.*, según enmendada.
[22] Véase, *Ley de la Oficina del Oficial de Construcción adscrita al Departamento de Asuntos del Consumidor*, Art. 9(c), 17 LPRA sec. 509(c).

contrato de opción, o a resolverlo por no haber el vendedor cumplido con sus obligaciones bajo el mismo, en cuyo caso tendrá derecho a que se le devuelvan íntegramente sus anticipos [...]"[23]. Asimismo, el contrato de promesa de compraventa o el de compraventa dispondrá de precio cierto, que no se podrá aumentar **a menos que sea por acuerdo entre partes**[24].

En lo relacionado con la construcción de viviendas privadas, el DACo promulgó el *Reglamento para Regular las Distintas Actividades que se llevan a cabo en el Negocio de la Construcción de Viviendas en Puerto Rico* (Reglamento Núm. 2268 del 17 de agosto de 1977). Este marco regulatorio, alineado a la Ley 130-1967, impone a la figura del urbanizador y/o constructor[25] la obligación de notificar **por correo certificado** a compradores y residentes sobre cambios que se vayan a presentar a los entes reguladores en torno a los proyectos de vivienda[26]. Su inobservancia se considera práctica indeseable.

Como antecede, tanto la *Ley de la Oficina del Oficial de Construcción*, supra, así como el *Reglamento para Regular las Distintas Actividades que se llevan a cabo en el Negocio de la Construcción de Viviendas en Puerto Rico*, supra, preceptúan lo que constituyen prácticas indeseables en la industria de la construcción. Por igual, disponen sobre el procedimiento para comunicar formalmente a los suscribientes sobre cambios en los acuerdos contractuales originales de proyectos de vivienda. Por lo tanto, las disposiciones discutidas observan un tratamiento formal de

---

[23] Véase, *Ley de la Oficina del Oficial de Construcción adscrita al Departamento de Asuntos del Consumidor*, Art. 10(b)(8), 17 LPRA sec. 510(b)(8).

[24] Véase, *Ley de la Oficina del Oficial de Construcción adscrita al Departamento de Asuntos del Consumidor*, Art. 10(c)(1), 17 LPRA sec. 510(c)(1).

[25] Véase, *Reglamento para Regular las Distintas Actividades que se llevan a cabo en el Negocio de la Construcción de Viviendas en Puerto Rico* (Reglamento Núm. 2268 del 17 de agosto de 1977), sec. 1(f). La definición de "urbanizador y/o constructor" no fue debatida por las partes.

[26] Véase, *Reglamento para Regular las Distintas Actividades que se llevan a cabo en el Negocio de la Construcción de Viviendas en Puerto Rico* (Reglamento Núm. 2268 del 17 de agosto de 1977), sec. 10.

notificación y no contempla el método telefónico como sustituto a comunicaciones intrínsicamente relacionadas a la delicada negociación que representa la adquisición de un bien inmueble.

En lo atinente al caso ante nuestra consideración, la conclusión de la agencia sobre el incumplimiento de contrato de NSB Vega Baja resulta correcta. El DACo determinó que NSB Vega Baja incumplió con el Reglamento 2268 al no notificar adecuadamente sobre el cambio o resolución del contrato, entiéndase, por **correo certificado**. Los hechos indican que el anuncio sobre el cambio en el precio pactado se realizó mediante llamada telefónica. NSB Vega Baja no evidenció otro esfuerzo de comunicación con los recurridos, por lo que se obvió el procedimiento reglamentario establecido y lo acordado en las cláusulas 25 y 27 de los contratos suscritos por las partes. El dictamen recurrido que ordena la venta de la propiedad a los querellantes al precio anunciado y el otorgamiento de la correspondiente escritura pública cumple como remedio disponible en ley[27]. Por consiguiente, el error señalado no fue cometido.

En su segundo señalamiento de error, la parte recurrente expuso, en síntesis, que el DACo erró al imponer el pago de honorarios de abogados por temeridad. Tampoco le asiste la razón.

La Ley 38-2017, *supra*, faculta al DACo a la imposición de honorarios de abogados. A su vez, el DACo, en virtud del Reglamento 8034, contempla este remedio. Adicionalmente, nuestra última instancia judicial ha subrayado la importancia de evitar litigios en donde impere la ausencia de fundamento. La consecuencia por dichas acciones se traduce en la imposición de penalidades al reclamante vencido en el litigio.

---

[27] Véase, pág. 0068, del Apéndice del recurso de la parte recurrente. *Resolución* recurrida.

A tenor con lo anterior, razonamos que el segundo error señalado no fue cometido. La parte recurrente ha sido temeraria al presentar una disputa inmeritoria e instar una acción que pudo haber sido evitada. En conclusión, el DACo impuso correctamente los honorarios por temeridad.

**IV**

Por los fundamentos antes expuestos, se *confirma* el dictamen recurrido.

Notifíquese.

Lo acordó y manda el Tribunal, y certifica la Secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones